**Richard HANDELSMAN and Jeffrey Wolfson, Plaintiffs,**

v.

**GILFORD SECURITIES, INC., Alan Alpern and H. Robert Holmes, Defendants.**

No. 87 C 8548.

United States District Court, N.D. Illinois, E.D.

Aug. 22, 1989.

Peter B. Shaeffer, Chicago, Ill., for plaintiffs.

Mary Kay Kelly, Jeffrey M. Rubin, Thomas P. Cimino, Jr., Phelan, Pope & John, Ltd., Chicago, Ill., for Alan Alpern.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Richard Handelsman ("Handelsman") and Jeffrey Wolfson ("Wolfson") initially sued Gilford Securities, Inc. ("Gilford"), Gridcomm, Inc. ("Gridcomm"),[1] Alan Alpern ("Alpern") and H. Robert Holmes ("Holmes") in a two-count Amended Complaint (the "Complaint"), alleging violations of Securities Exchange Act of 1934 ("1934 Act") § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (together "Section 10(b)"). After taking extensive deposition and document discovery, Alpern has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56(b).[2] Handelsman and Wolfson have responded in part with a Rule 56 motion of their own against Alpern.[3] For the reasons stated in this memorandum opinion and order, Alpern's motion is granted and the cross-motion is denied.

### Facts [4]

This dispute arises out of an investment made by Handelsman and Wolfson in Gridcomm. Both are private investors who trade in options and other securities and also invest as partners in private ventures.

In the spring of 1986 [5] Gridcomm sent its Chairman of the Board of Directors Alpern in search of additional working capital. Alpern eventually encountered Holmes, the president and resident manager of Gilford's Chicago office, who proceeded to arrange meetings with potential investors.

---

1. Gridcomm, because of its pending bankruptcy, was dropped from this action November 3, 1987.

2. Other summary judgment motions are still in the briefing stage, but the Alpern-related motions are sufficiently discrete to justify separate treatment.

3. See Appendix 1.

4. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v.*

Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual perspective that sometimes causes the denial of both motions. In this instance, though, that is not a problem at all.

5. All further dates in this opinion also refer to 1986 events.

In early June Handelsman and Wolfson met with Holmes to discuss Gridcomm and Gilford's view of Gridcomm. Although Handelsman and Wolfson received no written information about Gridcomm at that time, they expressed an interest in investing in Gridcomm, and Holmes said he would pursue the matter. When Holmes told Alpern about their interest, Alpern directed Gilford to speak to Gridcomm's attorneys about the mechanics of the investment.

Next Gridcomm sent Handelsman a letter (not authored by Alpern) dated June 9 (the "June 9 Letter"), which stated at the outset:

> This letter, when signed below, will constitute an agreement pursuant to which you agree to provide [Gridcomm] a letter of credit ["LOC"] in the amount of $250,-000.

Substantively the June 9 Letter:

> 1.  required that the LOC be unconditional and for a period of one year;
>
> 2.  provided some information about Gridcomm, adding:
>
> > You may make such further inquiries and inspections through [Gridcomm's] officers and records as you deem appropriate prior to the closing of this investment.
>
> and
>
> 3.  obligated Gridcomm to deliver two-year warrants for the purchase of 25,000 shares of common stock (1,000 shares for each $10,000 of LOC funds) at an exercise price of $9 per share.

As already stated, someone other than Alpern sent the letter to Handelsman and Wolfson. Handelsman signed it on behalf of their partnership (albeit in the wrong space, one provided for the signature of a Gridcomm representative). On June 19 Alpern affixed his signature on behalf of Gridcomm, and at some unknown time the typed portion of the signature section was corrected by handwriting to reflect accurately the affiliations of the two signatories.

Later (in the "June 27 Letter," sent *after* Handelsman and Wolfson had already made their investment) Alpern wrote to Handelsman outlining a change in the nature of the consideration that had been provided by Handelsman and Wolfson.[6] Instead of the LOC, Handelsman or Wolfson or both had requested on their behalf that they be permitted to put up collateral sufficient to enable Gridcomm to obtain a $250,000 loan, and that was covered in the June 27 Letter.[7] In addition the June 27 Letter provided:

> If you should exercise the Warrants prior to June 30, 1987, the proceeds from such exercise shall be used by [Gridcomm] to obtain release of the Collateral to the extent of such proceeds.
>
> \*   \*   \*   \*   \*   \*
>
> Please sign and return a copy of this letter signifying your agreement.

Handelsman signed the June 27 Letter too. Before he did so, Wolfson had already (on July 10) made a wire transfer of $250,-000, as was permitted by the already-described contractual change requested by the Handelsman–Wolfson partnership, to provide the requested collateral for the Gridcomm loan.

On October 1 Gridcomm filed a petition in bankruptcy. Handelsman and Wolfson now assert several material facts had been omitted or misrepresented to them regarding the investment. On the current motion, their relevant allegation is that in a phone call by Alpern on July 8 or 9 asking when the investment proceeds would be forthcoming and in the post-closing but backdated June 27 Letter (written by Alpern, but see n. 12), Alpern omitted facts relating to Gridcomm's financial condition, the development and performance of its product, the status of its available financing and its ability to market its product

---

6.  Despite its date, the June 27 Letter was not in fact sent to Handelsman and Wolfson until July 16, though the parties had obviously agreed to the change on or about June 27 (as shown by the July 10 transfer referred to in the next text paragraph). As discussed later in the text, Al-pern was not himself involved in the discussions leading to that change, and n. 12 explains the limited significance of the June 27 Letter for current purposes.

7.  See Appendix 2.

adequately. If those communications (the phone call and the later-sent June 27 Letter) were indeed subject to the requirements of Section 10(b), the omissions can be characterized as materially misleading.

## Section 10(b) Claim

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989) repeats the familiar Section 10(b) standards requiring Handelsman to prove [8] that Alpern:

> (1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused plaintiff[s'] loss.

For present purposes it may be assumed that Alpern's statements did not meet such a full-disclosure test—that there were indeed misleading omissions. It may also be assumed that the omitted facts were "material"—a term that usually refers to the importance of the information to the investment decision (see *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.1988)).[9] Those assumptions may be made because the key here is the second *Schlifke* element ("in connection with a securities transaction")—that is, whether the information withheld by Alpern may objectively be said to have affected the Handelsman–Wolfson investment decision (*id.*).

*Goodman v. Epstein*, 582 F.2d 388, 413 (7th Cir.1978) teaches:

> [T]he crucial fact in circumstances such as those at bar is whether an investment decision remains to be made by the party from whom disclosure is withheld, and not upon when the agreement to purchase or sell was executed.

Accord, such later cases as *Michaels v. Michaels*, 767 F.2d 1185, 1195 (7th Cir. 1985). That so-called "commitment doctrine" (hinging upon whether the defraud-

ed individual has already committed himself to the investment) was first expounded in *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir.1972). Although the application of that principle can pose problems in situations involving ongoing or successive investment decisions (see *Goodman* ), it is perfectly straightforward in one-shot transactions such as the Handelsman–Wolfson commitment to Gridcomm.[10]

If Handelsman and Wolfson were already committed to provide Gridcomm with an essentially identical (or no more onerous) source of credit before they closed the deal in accordance with the terms later memorialized in the June 27 Letter modification, so that no new investment decision was involved by reason of the revised arrangement, Alpern's *later* statements could not create potential Section 10(b) liability. That requires examination into:

> 1. whether the June 9 Letter was a binding contract and
> 2. whether any new investment risks were undertaken after Alpern's allegedly material omissions took place.

## June 9 Letter

*Radiation Dynamics*, 464 F.2d at 891 speaks in first-year law school terms:

> "Commitment" is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.

Viewed from that perspective, the June 9 Letter satisfies all the basics: offer and acceptance, consideration (in the sense of mutuality, let alone any lesser sense), and what have you. And it is of course irrelevant that Handelsman signed in the wrong

---

**8.** Because this opinion is written in the context of a Rule 56 motion, of course, the test is not one of proof by Handelsman and Wolfson, but rather one of their posing a material factual issue (with the benefit of the required inferences, see n. 4).

**9.** Both sides' memoranda expend energy in discussing "materiality" in a different sense—a

misnomer for the actual causation doctrine discussed below.

**10.** In the related area of common-law fraud, see our Court of Appeals' discussion in *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 619–20 (7th Cir. 1989).

place—that in no way detracts from his manifestation of acceptance (see, e.g., *First National Bank of Elgin v. Husted,* 57 Ill.App.2d 227, 230, 205 N.E.2d 780, 782 (2d Dist.1965) and authorities cited there).

Handelsman and Wolfson contend the language in the June 9 Letter permitting them to make "further inquiries and inspections ... prior to the closing of this investment" negates the formation of a binding commitment by permitting an escape hatch. But such a reading would run counter to the clear thrust of the parties' contractual undertakings. Their agreement—the provision of the $250,000 LOC in consideration for the issuance of warrants—expressly spoke in terms of a *present* commitment ("an agreement pursuant to which you [Handelsman and Wolfson] agree to provide ..."—that is, a *present* obligation to perform), even though it called for (as *Radiation Dynamics* also contemplated) a future "formal performance." Nowhere is it specified that the obligation to close is conditioned on what the permitted "future inquiries and inspections" might reveal, nor did the letter agreement include any specification of standards or conditions to be satisfied by those "inquiries and inspections."

Instead the only fair reading of that provision, unless the contractual language of *current* agreement is to be subverted entirely, is that the further investigation was at most to enable a Handelsman–Wolfson verification of the accuracy of whatever representations were made or were implicit in the deal. Any breach might then create an escape hatch, but that would be a *post*-agreement escape rather than one preventing a "meeting of the minds"—the formation of a current agreement—in the *Radiation Dynamics* sense. And it is worth observing at this point, for it tends to bear on each of the Handelsman–Wolfson contentions, that the June 27 Letter (which they urge *was* the parties' *binding agreement*) carries forward the identical provision allowing "future inquiries and inspections."

Nothing daunted, Handelsman and Wolfson urge such an investigation right was essential if the Gridcomm transaction were not to be considered a public offering. Securities Act of 1933 ("1933 Act") § 4(2), 15 U.S.C. § 77d(2) ("Section 4(2)"), exempts from the securities registration requirement "transactions by an issuer not involving any public offering." That exemption has caused the SEC to promulgate regulations requiring the issuer in a private offering to make an investigation available "to each purchaser at a reasonable time *prior to his purchase*" (17 C.F.R. §§ 230.-502(b)(2)(v) and .506 (emphasis added)). If the June 9 Letter were perceived as an effort to comply with those regulations, that would carry the implication that Gridcomm did not intend the purchase to be effective before the investigation.

No such reading is required. For one thing, the language of the June 9 Letter would of course permit an investigation before Handelsman and Wolfson signed it (and that would be a pre-purchase investigation under any view of the matter). Moreover, the June 9 Letter did not *require* Handelsman and Wolfson to carry out a post-signing investigation. To accept their interpretation would permit the absurd conclusion that they could avoid the contract entirely by never performing an investigation—that there would never be a contract unless they *did* conduct such an inquiry. Any such construction would do severe violence to the clear terms of the agreement.

In sum, the June 9 Letter extended an opportunity to Handelsman and Wolfson. If that opportunity were not deemed to precede their agreement to purchase, the only arguable consequence would be a possible violation of SEC regulations—not the negation of a binding contract. Handelsman and Wolfson cannot force an unnatural interpretation of contractual language just to fit that language into SEC regulations and thereby take it out of its normal sense of commitment. Contract law does not work that way.[11]

---

**11.** There is no need to consider (as the litigants' memoranda do) *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124–25, 73 S.Ct. 981, 984–85, 97 L.Ed. 1494 (1953), which construes Section 4(2) (un-

der its previous designation as Section 4(1)) to apply only to investors who are not able to "fend for themselves" in a securities transaction. Whether Handelsman and Wolfson were able to

*Alpern's July 8 or 9 Telephone Call*

Once it is recognized that the June 9 Letter marked the Handelsman–Wolfson "commitment" to the Gridcomm deal, they may avoid the consequences of that result only by showing (1) that the terms later outlined in the June 27 Letter, reflecting the way the transaction had actually closed on July 10, really memorialized a *new* purchase of securities for securities law purposes and (2) that Alpern was guilty of a material omission "in connection with" *that* new purchase.[12] Sensible Section 10(b) policies dictate that if the June 27 Letter did reflect such a "new deal" previously reached between the parties, Gridcomm's (or in this instance Alpern's) duty of disclosure of material facts would continue up to the time that the new agreement became effective.

*Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir.1977) describes the standard for determining when a new deal is created in that sense:

> Before changes in the rights of a security holder can qualify as the "purchase" of a new security under Section 10(b) and Rule 10b–5, there must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment.

Handelsman and Wolfson claim three "significant changes" were confirmed in the June 27 Letter.

First, that Letter reflected a revised undertaking by Handelsman–Wolfson: their posting of collateral to support a $250,000 loan rather than their direct provision of a $250,000 LOC. In the normal commercial LOC transaction, the party in the Handelsman–Wolfson position must pay a premium to the issuing bank *and* tie up $250,000 of its assets or credit to protect the bank against risk. Posting collateral instead saves the cost of the premium while requiring no more commitment of risk capital. As App. 2 reflects, Wolfson (who later wire transferred the money to Gridcomm) had requested a substitution-of-collateral arrangement for just such a reason, and Gridcomm's counsel had told Alpern of the same request having come from Handelsman. And as App. 2 further reflects, it was surely of no moment to Gridcomm just how it obtained the $250,000—if anything, the June 27 Letter version would be less rather than more advantageous to it than an unconditional LOC on which it could draw. From the Handelsman–Wolfson perspective, neither the investment's nature nor its risks underwent a "significant change" (an adverse one) under the terms confirmed after the closing by the new Letter.

Second, Handelsman and Wolfson note the June 27 Letter omits this language of the June 9 Letter:

> Should [Gridcomm] commence a public offering during the period that the Warrants are exercisable, [Gridcomm] will register at the same time the Warrants and the shares underlying the Warrants subject to a waiting period of 90 days if required by the underwriter therein.

Alpern responds that Warrant § 5–2 (a copy of the document as actually issued to Handelsman and Wolfson and *attached to* the June 27 Letter) afforded them essentially the same rights. It is really unconscionable for the Handelsman–Wolfson counsel to argue that the June 27 Letter, issued *after* the deal had closed and accom-

---

fend for themselves—as the evidence of their investment sophistication and wealth would appear to confirm—is really irrelevant to the contractual interpretation now at issue.

**12.** At this point in the analysis, it is important to dispel an area of confusion caused by the parties' backdating of the June 27 Letter. Because that Letter was sent *after* Handelsman and Wolfson had unquestionably completed their purchase by sending Gridcomm the $250,000 (and because that Letter was sent to memorialize the changed understanding reached in the Handelsman–Wolfson discussions with persons other than Alpern), by definition no misleading omission in that document could conceivably have been a "material" one bearing on their investment decision. Thus Handelsman and Wolfson can really complain only about Alpern's *oral* communication immediately before the funds were transmitted, in which he asked for the money they had already committed themselves to provide and he assertedly failed to disclose material facts. However, simply because the consummation of the deal took place in the manner later specified in the June 27 Letter, and not because that Letter could constitute a Section 10(b) violation, it is convenient for discussion purposes to refer to the document.

panied as it was by the actual form of warrant extending piggyback registration rights to Handelsman and Wolfson, had altered that part of the parties' deal.[13]

Finally, the June 27 Letter contains the new "use of proceeds" language requiring Gridcomm to use the proceeds from any Handelsman–Wolfson exercise of warrant options to release collateral to the extent of such proceeds. But that provision actually confirmed a *reduction* of their investment risk.

Thus nothing in the terms memorialized in the June 27 Letter created any new investment risks for Handelsman and Wolfson. It therefore parallels the situation to that discussed in *FDIC v. W.R. Grace*—no new duty of disclosure was created for Alpern so as to make any July 8 or 9 omissions on his part 1934–Act-violative.

Apart from those unsuccessful contentions of individual significant changes, Handelsman and Wolfson urge that because Alpern and Gridcomm have represented the June 27 Letter as reflecting the agreement of the parties, it effectively superseded the June 9 Letter. Though the latter is true,[14] it is also irrelevant. There is no inconsistency between the earlier holding in this opinion that the parties were bound by the June 9 Letter and a holding that the initial contract was modified by mutual agreement by a change later described in the June 27 Letter.[15] It is an everyday occurrence in the business world for people to reach a firm and mutually binding agreement and then, for one reason or another, reach a mutual agreement to modify its terms in some respects before closing—and in this instance confirmed after the closing.

But in an important—indeed dispositive—sense all this parsing of the transaction and the documents is really beside the mark. Even if the changes memorialized post-closing in the June 27 Letter *were*

perceived as reflecting a new "investment decision," it is abundantly clear and unquestioned that (1) any such investment decision had been made, and an agreement had been reached on its terms, well before July 8 or 9, (2) those things had taken place without *any* communication from Alpern to Handelsman or Wolfson and (3) the only preclosing communication from Alpern (his July 8 or 9 telephone call asking for the funds to be sent in accordance with the Handelsman–Wolfson firm commitment to do so) could not be treated as having affected the investment decision.

In summary, no new "investment decision" was made by Handelsman and Wolfson after the June 9 Letter had bound them to the deal. But even if it were otherwise—even if the changes spelled out postclosing in the June 27 Letter had reflected a new "investment decision"—it was independent of any representations ascribable to Alpern. And his July 8 or 9 telephone call, even if perceived as omitting otherwise material facts, had no legal significance in the securities law sense. Alpern must win on the Count 2 claim.

### Count 1 Scheme

In a last ditch effort, Handelsman and Wolfson contend that Count 1 alleges a "scheme to defraud" involving all the defendants, rendering Alpern responsible for more than just his own misrepresentations. But the short answer is that Alpern has filed a dispositive motion under Rule 56, not a threshold pleading attack under Rule 12(b)(6). What must be done to counter such a motion—and what Handelsman and Wolfson have not done—is to tender admissible evidence rather than pointing to their mere pleading allegations (see Rule 56(e) and, e.g., *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) and cases cited

---

**13.** Warrant § 5–2 actually grants any warrant holder the *opportunity* to have such warrants registered—but such a holder would not be subject to any additional risk unless it actually decided not to exercise the opportunity.

**14.** Gridcomm's SEC filings include only the June 27 Letter as the parties' final agreement.

**15.** Again it is Handelsman–Wolfson who may really be tarred with the brush of inconsistency. As already pointed out, the June 27 Letter contained the identical "future inquiries and inspections" language that they say prevented the June 9 Letter from being a binding agreement. Yet they have no trouble in ascribing that effect to the June 27 Letter despite that language.

there; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553).

There is no need to consider whether Count 1's generalized "scheme to defraud" allegations would survive Rule 9(b) scrutiny, for even if they could that would not be enough. Admissible evidentiary submissions leading to reasonable inferences of such a scheme are necessary, and they are totally absent from what Handelsman and Wolfson have proffered.

## CONCLUSION

Although it has been assumed arguendo that Alpern's pre-July 10 telephone call was lacking in full disclosure,[16] that occurred only after Handelsman and Wolfson were already committed to their investment under any view of the facts. There are no genuine issues of material fact, and Alpern is entitled to a judgment as a matter of law. This action is dismissed with prejudice as to Alpern.

Such a disposition may ordinarily carry with it an entitlement to a Rule 54(b) determination of finality despite the continued pendency of the action against Alpern's codefendants (*National Metalcrafters v. McNeil*, 784 F.2d 817, 820–21 (7th Cir. 1986)). In this instance, given the imminence of Rule 56 rulings as to those defendants as well, it may be worth awaiting the result of those motions before considering entry of a Rule 54(b) order. If either Alpern or Handelsman and Wolfson feel otherwise, he is or they are free to move for the appropriate determination.

### Appendix 1

Some brief amplification of this opinion's treatment of the Handelsman–Wolfson cross-motion for summary judgment may be useful. Handelsman and Wolfson filed their own Rule 56 motion only after the Alpern motion—which was of course potentially dispositive of the entire litigation against Alpern—had been fully submitted and briefed. In conceptual terms that is much akin to offering new evidence after a trial is over—after all, as this Court has often said, a properly supported summary judgment motion is really a substitute for a trial (to be precise, it asserts that no evidentiary trial is needed because the absence of any material factual dispute permits the case to be disposed of on the legal issues).

In any event, Handelsman and Wolfson have submitted a separate memorandum and a separate statement of uncontested facts in support of their own motion. However, none of the facts they identify alters in any way the analysis contained in the text of this opinion. And as for their new brief, it tenders new arguments not raised at all in their response to Alpern's motion. In light of the considerations mentioned in the preceding paragraph, the Handelsman–Wolfson failure to raise those legal contentions when they first had both the opportunity and the duty to do so may be viewed as a waiver of their ability to do so now (see both this Court's opinion in *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd and adopted*, 736 F.2d 388, 393 (7th Cir.1984), and particularly *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985) (quoting *Keene*, with emphasis added as to the impropriety of adding either factual or legal contentions after the summary judgment motion is fully submitted, and citing *Keene* in support of a waiver holding)).

Nonetheless, out of "an abundance of caution" (see *Publishers Resource*, 762 F.2d at 561 n. 2) this Court has carefully reviewed the new arguments that Handelsman and Wolfson claim entitle them to summary judgment. All are wholly without merit. In particular, Handelsman and Wolfson urge that cases such as *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) would impose a duty of disclosure from the outset on a corporate executive whose corporation is engaged in a securities offering. But whatever else might be said as to the principles underlying *Chiarella* and like cases,

---

**16.** It should be emphasized, lest the point is lost in the course of this analysis, that no holding to that effect has been made by this Court—either in this opinion or elsewhere. Were the result reached here to be modified or overturned, the misleading-material-omission issue would have to be litigated.

they clearly have no applicability to a situation such as the present one—where the investment decision was made before the targeted corporate officer ever had *any* contact, directly or otherwise, with the potential investor. No such reading of those cases—or of the appropriateness of applying such a doctrine in this case—is permissible, and neither any material factual dispute or any other legal argument is raised in the Handelsman–Wolfson cross-motion that would render summary judgment in Alpern's favor improper. Hence there is no need to have completed the submission and briefing process on the cross-motion.

*Appendix 2*

Handelsman and Wolfson seek to dispute how the change in contractual terms, as memorialized after the closing in the June 27 Letter, came about. In their response to Alpern's motion they include an affidavit by Handelsman—though perhaps significantly none by Wolfson—that reads in part (¶ 4):

> I never made any request to Gridcomm, Inc. or its attorneys for an accomodation [sic] to allow an investment of money as opposed to an investment in the form of a letter of credit. Due to the nature of my business, an investment of cash was a less desirable alternative than an investment by means of a letter of credit.

But that restricted denial is both incomplete and, in context, quite deceptive. Both Handelsman (Dep. 105, 110–11) and Wolfson (Dep. 25, 73, 85, 119) confirm they were acting as partners in their investment in Gridcomm, and of course that meant each could bind the partnership (and could bind each other in partnership dealings). And here is what Wolfson testified as to the change from an LOC to the collateral arrangement (Dep. 77–78):

> THE WITNESS: My conversations with Burns—BY MR. WEINHARDT:
>
> Q. Let me tell you what I'm looking for.
>
> A. Sure.
>
> Q. If your recollection permits, I would like to know what transpired between the two of you in that particular conversation.

> A. Okay, that particular one would be difficult. For sure I told him we're investing $250,000. I'm prepared to wire that money, if necessary, immediately. But what I would like to do is substitute $250,000 in cash with the equivalent in some tax-free municipal securities, which I had—which I currently owned and were doing nothing but sitting in a brokerage account.
>
> From there, there were several conversations with Mr. Burns over the next few days as to whether or not—whether or not my security, you know, whether the bonds were good security or not. He said he would have to check with his people.
>
> Q. In the first conversation you had with Mr. Burns, what did he say in response to your desire to substitute the bonds as security?
>
> A. It's possible. Possible. He couldn't guarantee they were acceptable but it's possible.
>
> I did not have the bonds in my name at that point. I had them in street name. It's very common.
>
> If you go to any brokerage house or buy bonds or anything, it's kept in your account but it's in what's called street name.

And although the following statement is of course hearsay as to the truth of the statement there attributed to Handelsman, it is worth noting that Alpern Dep. 282 reflects this understanding he obtained from Gridcomm's counsel's report of a conversation directly with Handelsman:

> A. They said Mr. Handelsman did not want to proceed by putting up a letter of credit as provided for in his commitment of June 9th, that he preferred to put up other collateral. Apparently Mr. Lagana or somebody had arranged for him to put that collateral up at Security Pacific Bank, which would then extend the loan to GridComm. This was an accommodation to Mr. Handelsman, and this letter reflects the way the transaction was actually consummated. And I accommodated him by signing this letter and sending it to him after the fact.

Q. What attorney gave you that information?

A. Counsel for the company.

In pure evidentiary terms, it might be said that the Handelsman–Wolfson failure to strike the reference to that deposition excerpt, as contained in Alpern's statement of material facts in support of the current motion, could be argued to have waived the hearsay objection.

But this Court need not and does not deal in such technical terms. Based on Wolfson's statement alone two points are clear:

1. It *was* Wolfson who requested the change (and that request was therefore ascribable to Handelsman too, for Wolfson spoke of the *entire* $250,000 obligation).

2. Because the request was to post collateral that would enable *Gridcomm* to borrow $250,000, no use of liquid cash by the investors was a condition of the deal—and that is the only thing Handelsman seeks to negate in his affidavit.

It can scarcely be viewed as accidental that Handelsman does *not* negate, or even speak about, any request to permit collateral to be put up as Wolfson requested and as the June 27 Letter provided. Even with reasonable pro-plaintiff inferences, then, Alpern's version of which side initiated the change embodied in the June 27 Letter is established on the present motion. And as a final clincher, that factual issue would not be material in the outcome-determinative sense anyway.