**Richard HANDELSMAN and Jeffrey Wolfson, Plaintiffs,**

**v.**

**GILFORD SECURITIES INCORPORATED, Alan N. Alpern and H. Robert Holmes, Defendants.**

**No. 87 C 8548.**

United States District Court, N.D. Illinois, E.D.

Nov. 8, 1989.

---

Peter B. Shaeffer, Chicago, Ill., for plaintiffs.

Myron M. Cherry, William R. Coulson, Cherry & Flynn, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Richard Handelsman ("Handelsman") and Jeffrey Wolfson ("Wolfson") initially sued Gilford Securities, Inc. ("Gilford"), Gridcomm, Inc. ("Gridcomm"), Alan Alpern

("Alpern") and H. Robert Holmes ("Holmes") in a two-count Amended Complaint (the "Complaint"), alleging violations of Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (together "Section 10(b)"). On November 3, 1987 Gridcomm was dropped from this action because of its pending bankruptcy proceeding.

After taking extensive deposition and document discovery, defendants Alpern, Gilford and Holmes filed motions for summary judgment on both counts of the Complaint under Fed.R.Civ.P. ("Rule") 56(b). Handelsman and Wolfson responded with their own cross-motions for summary judgment. This Court's August 22, 1989 memorandum opinion and order (the "Opinion," 720 F.Supp. 1319*), granted Alpern's summary judgment motion, dismissing him from this action with prejudice.

Since then the other two cross-motions (one filed by remaining defendants Gilford and Holmes and the other by coplaintiffs Handelsman and Wolfson) have been fully briefed and are now ripe for decision. For the reasons stated in this memorandum opinion and order, both motions are denied.

### Facts [1]

As described in the Opinion, this dispute arises out of an investment made by plaintiffs in Gridcomm. Because the Opinion dealt with issues different from those implicated here, it is useful to revisit the facts underlying plaintiffs' claims.

Handelsman and Wolfson are private investors who (1) maintain a joint trading account for the purpose of trading stock and options and also (2) invest as partners in various private ventures. Before Gridcomm filed its application for relief under Chapter 11 of the Bankruptcy Code, that corporation was developing a technology that it hoped would permit the transfer of data from one computer to another across common AC power lines. Alpern is Chairman of Gridcomm's Board of Directors. Gilford is the securities firm that underwrote the securities offering by which Gridcomm went public in July 1985, and Holmes is its president and resident manager of its Chicago office.

Some time before the end of 1985, Gridcomm arranged for International Microelectronic Products ("IMP") to design and produce a custom silicon chip for use in Gridcomm's products. Gridcomm's literature said those chips would permit reliable and cost-effective mass production of the Gridcomm products. As will be seen, difficulties encountered in the production of the chips figured prominently in Gridcomm's troubled life.

IMP was originally scheduled to deliver a working custom chip on January 31, 1986.[2] When the chips finally arrived on February 26, Gridcomm found they were not usable and sent IMP back to the drawing board. At the same time it proceeded to design a circuit board that would make the chip unnecessary, and it began the delivery of products incorporating the circuit board in the late spring.

Also in the spring of 1986, Gridcomm sent Alpern in search of additional working capital. Alpern turned to Gilford to raise short-term capital, in addition to discussing long-term financing with another broker-dealer, D.H. Blair & Co., Inc.

Although the long-term financing was never completed and generated no funds for Gridcomm, Gilford's efforts to find short-term financing bore more fruit. Holmes arranged a meeting in early June with Handelsman and Wolfson to discuss Gridcomm and Gilford's view of Gridcomm's prospects. According to Handels-

---

\* Citations to the Opinion will take the form "Opinion at ——," including the page number but omitting the F.Supp. volume number.

1. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual Janus-like perspective that sometimes causes the denial of both motions— as has indeed happened here.

2. All further dates without year references will refer to 1986.

man, Holmes described Gridcomm's business and profit potential to them, telling them Gridcomm had a multi-million dollar backlog of orders and was trying to raise $1 million for working capital. Even though Handelsman and Wolfson had then received no written information about the corporation, they expressed an interest in investing in Gridcomm. Holmes told them that the investment was not available to them at that time because it was oversubscribed,[3] but he would communicate with them if an opportunity to invest arose.

Within a week of that initial conversation, Holmes called Handelsman and told him a $250,000 investment in Gridcomm was available. Handelsman replied that he and Wolfson would make the investment. Holmes made no further representations about Gridcomm at the time.

Shortly thereafter Wolfson called Holmes to inquire about the risks involved in the Gridcomm investment. According to Wolfson, Holmes said that a bank had lent money against some of Gridcomm's accounts receivable, that Gridcomm had a large backlog of orders, that the Handelsman–Wolfson investment would be repaid as soon as the $2 million in long-term financing was completed, that the only way the additional long-term financing would not be raised was if Gilford "went under," and that Gilford was so sure about the deal that it was putting its own pension money into the investment.

Next Gridcomm sent Handelsman a letter dated June 9 (the "June 9 Letter"), which stated the terms of their agreement and included the following:

This letter, when signed below, will constitute an agreement pursuant to which you agree to provide [Gridcomm] a letter of credit ["LOC"] in the amount of $250,000.

Under the terms of the June 9 Letter Gridcomm became obligated, in consideration for plaintiffs' investment, to deliver two-year warrants for the purchase of 25,000 shares of common stock (1,000 shares for each $10,000 of LOC funds) at an exercise price of $9 per share. Handelsman signed the June 9 Letter on behalf of his partnership with Wolfson, and on June 19 Alpern affixed his signature on behalf of Gridcomm.

On June 23 Gridcomm received delivery from IMP of the second iteration of the custom chip and began testing it. Though the evidence fails to show precisely when Gridcomm determined that the new chip also failed to work, Gridcomm's technical management issued a July 8 report stating that conclusion.

In the "June 27 Letter," sent *after* Handelsman and Wolfson had already committed themselves to their investment, Alpern wrote to Handelsman outlining a change in the nature of the consideration running from Handelsman and Wolfson. Instead of the LOC, Handelsman or Wolfson or both had asked that they be permitted to put up collateral sufficient to enable Gridcomm to obtain a $250,000 loan.[4]

Handelsman signed the June 27 Letter. Before he did so, but after Holmes had made several telephone calls to the partnership asking when the investment proceeds would be forthcoming, Wolfson (on July 10) made a wire transfer of $250,000—as permitted by the revised arrangement requested by the Handelsman–Wolfson partnership—to provide the collateral for the Gridcomm loan. Then, as already indicated, on October 1 Gridcomm filed its Chapter 11 petition in bankruptcy.

Handelsman and Wolfson now assert several material facts had been omitted or misrepresented to them in the various conversations among the parties. They contend that Holmes made three affirmative misrepresentations during their meeting in early June:

---

3. Handelsman and Wolfson themselves do not agree whether Holmes called the investment "oversubscribed" or "fully subscribed" (see Handelsman Dep. 48; Wolfson Dep. 62). Presumably the difference is not material.

4. This Court held in the Opinion that the June 27 Letter had no independent significance to the transaction. Agreement had already been reached and was binding on the parties no later than the signing of the June 9 Letter.

1. that Gridcomm sought plaintiffs' investment as part of a $1 million financing package made up of four $250,000 units;

2. that the financing package was fully subscribed; and

3. that Gridcomm had a multi-million dollar backlog of orders.

Plaintiffs further say that Holmes made two more affirmative misrepresentations to Wolfson when Wolfson phoned Holmes a few days later:

1. that Gridcomm had plenty of accounts receivable;[5] and

2. that Gilford intended to place a later $2 million offering to provide long-term financing, and the only way this offering would not be completed would be if Gilford "went under."

In addition, Plaintiffs assert three broad types of material omissions:

1. omissions as to Gridcomm's financial condition:

(a) failure to disclose Gridcomm's inability to obtain alternate financing;

(b) failure to disclose existing bank financing encumbering Gridcomm's accounts receivable;

(c) failure to disclose the extent of purchase orders; and

(d) failure to provide plaintiffs with Gridcomm's financial statements and a description of Gridcomm's business prospects;

2. omissions as to Gilford's financial interest in having the financing fully subscribed (including Gilford's direct investment interest in Gridcomm and its indirect interest resulting from its customers' investments); and

3. omissions as to Gridcomm's product:

(a) failure to disclose performance problems;

(b) failure to disclose the delays in development; and

(c) failure to disclose the need for Gridcomm to engage in exchanges involving modified versions of its product.

### Section 10(b) Liability

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989) repeats the now-familiar standards for civil liability under Section 10(b):

In order to state a claim under [Section 10(b)], the plaintiffs must demonstrate that the [defendant]: (1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused plaintiff's loss.

Those standards bristle with a number of concepts that require some fleshing out.

One of those concepts, of course, is that of materiality. On that score *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988) repeats the two definitions the Supreme Court has given in the Section 10(b) context:

An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell. *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) [other citations omitted]. Put another way, an omission or misstatement is material under [Section 10(b)] if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering the " 'total mix' of information made available." *Levinson*, 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

As for the "in connection with" requirement, *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) teaches it must be read flexibly to

**5.** Plaintiffs argue, in the alternative, that if this is not an affirmative misrepresentation it is at least a material omission—a failure to disclose that Gridcomm's receivables were encumbered by prior bank financing.

encompass all omissions or misrepresentations "touching" a purchase or sale of securities. On the other hand, Opinion at 1321 holds that the only statements or omissions actionable under Section 10(b) in this case are those made before plaintiffs became committed to making the investment. Because Opinion at 1324 found that took place when Alpern signed on behalf of Gridcomm, only statements or omissions before June 19 are actionable.[6]

Scienter is the next component required for Section 10(b) liability. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) has expressly left open the question whether such liability may be predicated on something less than affirmative intent to deceive. In this Circuit, however, *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977) (quoting *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D.Okla.1976)) has held recklessness is actionable:

> [R]eckless conduct may be defined as a highly unreasonable omission involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Courts should not be liberal in finding such recklessness, and mere negligence is not actionable (*Rankow v. First Chicago Corp.*, 870 F.2d 356, 367 (7th Cir.1989)).

Lastly, causation is generally spoken of as embracing two elements: transaction causation and loss causation. Each merits brief discussion.

■ First, the misrepresentation or omission must "cause" the investment decision that led to plaintiffs' loss. Courts generally treat that concept under the heading of "reliance"—plaintiffs must have relied on the misrepresentation or omission in deciding whether or not to invest (see, e.g., *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir.1981)). Reliance on the misrepresentation or omission need not be the sole cause of plaintiffs' decision to invest, but must be a " 'substantial,' i.e., a significant contributing cause" (*id.*, quoting *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 34 (2d Cir.1976)). In material-omission cases a plaintiff's burden of proof is lessened somewhat: *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) held that reliance will be presumed in cases involving omissions where the omitted fact is found to be material.[7]

■ Second, plaintiffs must show loss causation, as defined in *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.1988):

> "Loss causation" means that the investor would not have suffered a loss if the facts were what he believed them to be.

*Sundstrand*, 553 F.2d at 1051, quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 695, 50 L.Ed.2d 701 (1977), explains that if plaintiffs' loss is caused by an independent intervening event, the securities laws will not hold responsible a defendant who makes an unrelated misstatement or omission:

> Plaintiffs must prove [securities law] injury, which is to say injury of the type the [securities] laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the [fraudulent] effect either of the violation or of [fraudulent] acts made possible by the violation. It should, in short, be "the type of loss

---

**6.** With respect to omissions, this holding interacts with the scienter requirement next discussed in the text to mean that defendants must have known or recklessly failed to recognize the allegedly omitted fact before June 19.

**7.** Another lessening of proof requirement is found in the fraud-on-the-market theory, by which some courts (including a plurality of the Supreme Court in *Basic*, 108 S.Ct. at 988–92) have presumed reliance where the purchase or sale of securities was conducted over an impersonal securities exchange and the alleged misrepresentation or omission was found to have affected the market price. *Such is not the case at hand, however.*

that the claimed violations ... would be likely to cause."

See also *Panter v. Marshall Field & Co.,* 646 F.2d 271, 291 (7th Cir.1981):

[I]t was not the failure to disclose Neiman–Marcus' presence which caused the withdrawal of the offer, but rather Field's actual entry into the Galleria which caused the withdrawal of the Offer.

Those just-outlined principles guide the analysis here. This opinion turns to that task.

### Claimed Misrepresentations and Omissions

#### 1. Early June Meeting

■ Plaintiffs assert three misstatements by defendants arising out of the meeting among Holmes, Handelsman, Wolfson and attorney Melvin Katten at Wolfson's offices in early June. Defendants' argument that none of those statements was made "in connection with" the purchase or sale of a security is a red herring wholly without merit, and may be dealt with briefly.

Defendants claim that any statements allegedly made in the early June meeting were not made "in connection with" such purchase or sale, by virtue of Holmes' insistence at the time that the investment was already fully subscribed and therefore not available to plaintiffs. That argument scarcely rises even to the colorable level. Clearly a broker's statement as to the advisability of an investment "touches" that investment even if the actual sale was not consummated until several days later. In its most extreme form, defendants' contention would do violence to the purposes of Section 10(b) by insulating from liability any statements, however false, made on a

day other than that on which the purchase or sale was consummated. And the situation is not changed by the off-again on-again sequence of the negotiations here.

#### A. Investment Package

■ Both Handelsman and Wolfson testified that at the early June meeting Holmes represented that an investment by plaintiffs would be part of a $1 million financing package made up of four $250,000 units. They label that statement as untrue when made, primarily on the ground that the ultimate result of Gridcomm's efforts to elicit investments netted only $750,000.

■ Defendants do not contend either that Holmes never made the statement or that it was immaterial.[8] Instead defendants argue there is no evidence that plaintiffs relied on the alleged falsehoods. Indeed, defendants urge plaintiffs could not have relied on the statement because neither the June 9 Letter nor the June 27 Letter conditioned the investment on the ability to raise $1 million as a package. That position is unconvincing.

Defendants correctly point to *Teamsters Local Pension Trust Fund 282 v. Angelos,* 762 F.2d 522, 529–30 (7th Cir.1985) and *Schlifke,* 866 F.2d at 944 for the proposition that terms of a written agreement control oral statements at variance (a staple parol evidence rule argument). Defendants fail, however, to recognize that the *Angelos–Schlifke* exception applies only if the inaccurate oral statements were "explicitly" and "unequivocally" contradicted by accurate disclosures incorporated in written agreements (see *Schlifke,* 866 F.2d at 944). Here, on the contrary, though the alleged oral promise was not reconfirmed

---

**8.** Defendants confuse the issues of materiality and reliance when they argue that the statement must have been immaterial as a matter of law because plaintiffs did not rely on it, as evidenced by their failure to incorporate it as a condition in the agreement. Their reliance argument, however, has nothing to do with the test of materiality as expressed in *Basic,* 108 S.Ct. at 983. Even if these plaintiffs did not in fact rely on the statement (which the text ac-

companying this footnote concludes is not a foregone conclusion), it is undoubtedly the kind of information a reasonable investor would have considered important in making the investment decision. Plaintiffs were told $1 million would get Gridcomm through its current cash flow troubles. Surely a reasonable investor would want to know whether the financing sought would meet the company's needs.

by the written agreement, it was certainly not *contradicted*.

■ Nevertheless, plaintiffs have failed to put forth any evidence from which the trier of fact could find either scienter or loss causation.[9] Although plaintiffs insist they "have not abandoned this claim" (P.R. Mem. 12), all the evidence they identify in this area is (1) their testimony as to assurances by Holmes that Gridcomm was raising $1 million and (2) the fact that Gridcomm actually raised only $750,000.

On the scienter front, defendants have proffered uncontradicted evidence tending to show that they and Gridcomm believed they had $1 million of financing lined up, but a $250,000 shortfall resulted when one of the prospective investors (Moshe Shaltiel) unexpectedly decided to pass up the investment. Even when all the facts are viewed in the light most favorable to plaintiffs, they have utterly failed to point to anything to produce a reasonable inference that defendants' state of mind was otherwise.

As for causation, plaintiffs have failed even to assert that the $250,000 shortfall in any way caused them loss. What emerges from the testimony is the picture of a company brought down by technical problems and a failure to obtain long-term financing to enable it to improve its product. This Court finds it impossible to infer from the proffered evidence regarding the "package" issue that plaintiffs "would not have suffered a loss if the facts were what [they] believed them to be" (*LHLC*, 842 F.2d at 931).

B. *Subscription*

■ Plaintiffs' second—and related—claim is that Holmes falsely represented to them that the investment in Gridcomm was fully subscribed at the time of the early June meeting. That claim too is without merit.

Alpern testified that Gridcomm had obtained an expression of interest[10] from another investor, Harry Lipsig, who was willing to invest $500,000. Alpern further testified that Gilford's Ralph Worthington ("Worthington") told him that Gilford had lined up $750,000 of interest in Chicago, so Alpern decided to cut Lipsig back to $250,000 to avoid giving him a controlling interest.

Plaintiffs do not dispute that testimony. Instead they point out that it fails to address the date on which Alpern first spoke to Worthington about Lipsig's desire to invest $500,000. Hence, plaintiffs argue, defendants have failed to bring forth evidence tending to show that they knew of the $500,000 interest, and they therefore gained a belief that the investment was fully subscribed, before speaking to plaintiffs in early June.

Although to be sure the evidence does not establish the date on which defendants gained their knowledge, plaintiffs forget that on their own summary judgment motion the proper question is whether *they* and not defendants have met their evidentiary burden. Alpern's failure to testify that he had informed Gilford of the amount of Lipsig's interest before the early June meeting with plaintiffs does not relieve plaintiffs of *their* burden to produce affirmative evidence that Alpern did not so inform Gilford. This Court finds plaintiffs' suggested inference—that Alpern's discussing Lipsig's interest with Gilford after the early June meeting implies that Gilford

---

9. Truth is also in issue, but since the statement was basically one of intention, the issue of the truth or falsity of the statement folds into the state of mind of the speaker. This Court's determination that no evidence of scienter has been adduced necessarily implies that the statement of intention was not false when made.

10. Plaintiffs point out that the expression of interest was not a "commitment" to invest. That, however, is a non sequitur. Plaintiffs have not alleged that Holmes represented to them that those who had "subscribed" to the investment were irrevocably committed to invest. Nor indeed could plaintiffs have relied on such a representation in making their investment decision, because Holmes' later phone call to Wolfson in which Holmes offered the investment would have put plaintiffs on notice that one of the purportedly committed investors had bowed out and left room for plaintiffs to step in.

had not heard of Lipsig's interest before that date—unpersuasive.[11]

When the other side of the coin is examined—that of defendants' cross-motion, on which the reasonable inferences must be cast in plaintiffs' favor (see n. 1)—the result is no different. No reasonable inference at all stems from the timing of Alpern's mention of Lipsig's interest to Gilford's representatives. That being the case, it is immaterial that defendants tendered no affirmative proof that they were aware of Lipsig's interest before the early June meeting. Hence defendants prevail on this issue on their cross-motion as well as on plaintiffs' motion.

### C. *Backlog*

[8] Plaintiffs call the "central, factual issue of dispute" in this case whether defendants misrepresented the truth when Holmes described Gridcomm's multi-million dollar backlog of orders at the early June meeting. Plaintiffs argue the "orders" Holmes referred to were too contingent to have been termed orders at all without a contemporaneous disclosure of the contingencies.[12]

■ Unquestionably Gridcomm's claimed orders were indeed contingent on a number of things, including the buyers' satisfaction with the delivered products. Whether Holmes' representation of those as orders was misleading is a question of fact that this Court need not address because plaintiffs have failed, once again, to point to any evidence that defendants were aware that the orders were subject to any contingencies when the statement was made.[13] Holmes' later testimony that Gridcomm may have given him "bad numbers" is not an admission that Holmes was aware of the terms of the orders, and knowledge at the end of the summer as customers began to cancel will not support an inference of knowledge earlier—in June (*Morgan v. Prudential Group, Inc.*, 527 F.Supp. 957, 959 (S.D.N.Y.1981)).

### 2. Holmes–Wolfson Telephone Conference

#### A. *Accounts Receivable*

Plaintiffs claim that Holmes told Wolfson that Gridcomm had accounts receivable without disclosing that they were encumbered by previous bank financing. Their own allegation is belied, however, by Wolfson's own testimony (Wolfson Dep. 70), in which he admits that he was told of the previous encumbrance.

#### B. *Proposed Public Offering*

[10] Plaintiffs claim that Holmes told Wolfson that Gilford intended to underwrite a later $2 million public offering, the proceeds of which would be used to pay off plaintiffs' investment. Wolfson Dep. 70 refers to Holmes as having said, "The only thing that could really keep us from raising this money is Gilford going under." Plain-

---

**11.** It is scarcely necessary to repeat that on plaintiffs' summary judgment motion the reasonable inferences run away from, not toward, them (see n. 1).

**12.** Both parties seem to be asking this Court to rule on whether those "orders" were or were not orders as a matter of law, and therefore whether the statement was or was not "true." While that presents fascinating metaphysical and linguistic questions, this opinion need not address them. Regardless of whether the statement was or was not true in light of Holmes' use of the word "order," the more pertinent question is whether the statement was rendered misleading by Holmes' failure to disclose the applicable contingencies. Holmes' statement might better be classified an omission than a misstatement, but that distinction does not change the analysis in the text.

**13.** Defendants also question the materiality of the backlog of orders, citing Handelsman's testimony that he did not initially know whether the backlog reflected positively or negatively on Gridcomm. That misses the mark for several reasons. First, the materiality inquiry asks about the "reasonable investor." Handelsman's reaction is not dispositive as to the reaction of a reasonable investor, although it may be probative of Handelsman's reliance or nonreliance on the information. Second, materiality requires only that the information be "important," not that it reflect either positively or negatively on the investment. Third and most significant, the issue is not whether the backlog was itself material, but rather whether the contingencies that assertedly should have been disclosed were material. Viewed in that light, the contingencies could have been material to plaintiffs' evaluation of the ramifications of the disclosed backlog.

tiffs insist that because Gilford had no firm agreement to handle that offering, that statement was false or misleading.

As with so many of the issues in this case, the dispute comes down to a question of defendants' scienter. And, as with so many of the other issues, plaintiffs have failed to show any evidence of such scienter. Conversations between executives of Gridcomm and Gilford as to long-term financing began as early as April, and efforts to secure such financing continued through July. Wolfson himself testified to having the opinion that Holmes believed financing would be found (Wolfson Dep. 29–30).

### 3. Miscellaneous Omissions

#### A. *Gridcomm's Financial Condition*

Most of the claimed omissions relating to Gridcomm's financial condition are simply restatements of the matters already discussed. First, the asserted failure to disclose Gridcomm's inability to obtain alternate financing reasserts in the form of an omission the claimed misstatement just dealt with in Section 2(B) of this opinion. Like its counterpart, the claim fails for lack of evidence of scienter. Second, the asserted failure to disclose existing bank financing encumbering Gridcomm's accounts receivable simply restates the contention dealt with in Section 2(A), and it similarly fails for lack of evidence of the omission itself. Third, the claimed failure to disclose the extent of purchase orders and Gridcomm's inability to meet the terms of the purchase orders restates the claim in Section 1(C), and it too fails for lack of evidence of scienter.

■■■■ Plaintiffs' fourth argument as to Gridcomm's finances, although new, is

also without merit. Descriptions of "business prospects" are the very kind of tentative predictions that *Panter*, 646 F.2d at 292–93 has held immaterial as a matter of law. In addition, plaintiffs have failed to explain (or even assert) what information contained in Gridcomm's financial statements would have been material to plaintiffs' investment decision. Although financial statements theoretically contain much information pertinent to the health of a company, plaintiffs are obligated to point out to the court *some* contents that would make one of defendants' other statements misleading. They have not.

#### B. *Gilford's Financial Interest*

Plaintiffs' contention that Holmes failed to disclose Gilford's financial interest in having the financing fully subscribed borders on the frivolous. It is uncontroverted that Holmes told defendants he was so sure of Gridcomm's ability to succeed that Gilford's pension fund plan was itself planning to invest in Gridcomm (Wolfson Dep. 70). What more he could have said this Court does not know.

#### C. *Gridcomm's Product*

■■■■ To this point plaintiffs' case has not passed muster on any claim. But their last contention—that defendants failed to disclose problems with Gridcomm's product—raises genuine issues of material fact for trial. Because plaintiffs' motion for summary judgment fails on all claims and defendants' motion fails on this one, the matter will be set for trial.[14]

■■■■ Defendants do not claim to have disclosed problems with Gridcomm's product, so it may be assumed no such disclosure was made. Defendants have also not

---

**14.** As this Court noted in Opinion at 15, plaintiffs make a last ditch effort to save an additional issue for trial—the Count 1 "scheme to defraud" allegation—by ignoring it. This Court, however, may no more ignore the summary judgment motion of defendants Holmes and Gilford on Count 1 than it could ignore the similar motion of defendant Alpern. As Opinion at 15 held, defendants' Rule 56 motion requires plaintiffs:

to tender admissible evidence rather than pointing to their mere pleading allegations (see Rule 56(e) and, e.g., *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49 [106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202] (1986) and cases cited there; *Celotex,* 477 U.S. at 324 [106 S.Ct. at 2553]).... Admissible evidentiary submissions leading to reasonable inferences of such a scheme are necessary, and they are totally absent from what Handelsman and Wolfson have proffered.

argued (nor could they) that any such information would be immaterial as a matter of law, and because an omission is at issue, reliance may be presumed under *Affiliated Ute.* Nor is there any question that difficulties encountered in the development and production of Gridcomm's product "caused" plaintiffs' loss in the sense contemplated by Section 10(b).[15]

Instead defendants have tried to justify the omission on the ground that the performance problems and development delays did not occur until after plaintiffs had signed the June 9 Letter and had thus become bound to invest in Gridcomm, so that defendants could not have had the requisite scienter to be liable under Section 10(b). But the evidence does not compel that conclusion.

Genuine issues of material fact remain as to defendants' knowledge of the risks posed by the repeated failures of the custom chip. From the perspective most favorable to plaintiffs' case, the relevant testimony is the statement by Worthington that Alpern informed him as early as January 23 that Gridcomm would receive delivery of the first custom chips on February 20, some three weeks later than originally scheduled. Thus Worthington was apparently aware early on of both the product's reliance on the chip and at least the initial delay in the chip's development.

It is unclear precisely when Gilford was first informed of the failure of the first chip. Plaintiffs offer the testimony and handwritten notes of Benjamin Kopin, a securities analyst at Gilford, which show that Kopin met with Alpern on June 10 to discuss Gridcomm and that they discussed the status of the chip. Kopin testified that he asked about the chip because it was his understanding that the chip was "important" (Kopin Dep. 144) and that it "didn't work" (Kopin Dep. 136). Alpern reassured him that a new chip was due from the designer on June 20.

That same evidence also reflects that Worthington and another Gilford repre-

sentative met with Alpern again on June 20 to discuss Gridcomm. Kopin's notes show that Worthington was told the Gridcomm chip "should be o.k. this time" (P.Ex. 8 at 00066).

To be sure, the evidence does not reveal whether either of those meetings was held before the early June meeting or the signing of the June 9 Letter by plaintiffs. Nor does the evidence disclose when Gilford officials first became aware of the chip problems, or whether any of the participants in those meetings ever informed Holmes of the problems with the chip. Nevertheless plaintiffs need not *prove* their case to withstand summary judgment. At a minimum, the matters already discussed show the possibility that Gridcomm officials knew of the importance of the chip and of the problems Gridcomm was experiencing in developing it. While the securities laws do not require defendants to have predicted in June that the problems associated with the chip would cause customers to return or refuse delivery of Gridcomm products, it does require defendants not to have acted recklessly with respect to known risks.

Here it may reasonably be inferred that defendants knew the success of the product was related to the successful development of a computer chip but failed to disclose that fact to plaintiffs. Defendants' offer to make available to plaintiffs any information they desired as to Gridcomm's prospects could not substitute for such disclosure, because without a preliminary disclosure of the risks posed by the chip (or for that matter the chip's existence) plaintiffs would not have even known what inquiries to make. Further facts are necessary to resolve this factual issue.

### Conclusion

For defendants to prevail on summary judgment, they must show that none of plaintiffs' contended-for misrepresentations or omissions could support a Section 10(b) claim. Defendants have met that require-

---

**15.** Unlike the situation with most of plaintiffs' other contentions, a reasonable jury could easily conclude from the facts presented that plaintiffs would not have lost their investment had Gridcomm's product operated as well as defendants' representations suggested.

ment as to all but one of plaintiffs' contentions—that is, in all respects save that referred to in the next paragraph, there are no genuine issues of material fact and defendants are entitled to prevail as a matter of law.[16]

But this Court does find that plaintiffs' claim based on asserted omissions as to the status of Gridcomm's product does raise genuine issues of material fact sufficient to withstand defendants' summary judgment attack. That issue must go to trial, and this action is set for a status hearing at 9 a.m. November 22, 1989 to discuss the necessary preconditions to that end.

---

16. This opinion advisedly uses "entitled to prevail" rather than the term "judgment" employed in Rule 56(c). Because this opinion is not fully dispositive as to all plaintiffs' claims, Rule 54(b) makes any talk of a "judgment" for defendants premature.