**GRAND UNION MOUNT KISCO EM-PLOYEES FEDERAL CREDIT UNION, Plaintiff,**

v.

**Sydney KANARYK, John Doe and Jane Doe, Defendants.**

No. 89 Civ. 6890 (CHT).

United States District Court, S.D. New York.

March 16, 1994.

Michael P. Arra, White Plains, NY, for plaintiff.

Richard S. Scanlan, White Plains, NY, for defendants.

## ORDER AND OPINION

TENNEY, District Judge.

Plaintiff, the Grand Union Mount Kisco Employees Federal Credit Union (the "Credit Union"), a federally insured and chartered credit union, brings this civil action against its former treasurer, defendant Stanley Kanaryk ("Kanaryk"), for common law fraud and breach of fiduciary duty in the management of the Credit Union's financial affairs. The Credit Union is a New York corporation and Kanaryk is a citizen of Florida; therefore, diversity jurisdiction is proper under 28 U.S.C. § 1332(a) (1988). Plaintiff also claims jurisdiction under 28 U.S.C. § 1331, on the basis of an implied federal cause of action and federal common law. On September 29 and 30, 1993, this court held a bench trial. At the end of trial, defendant moved pursuant to Fed.R.Civ.P. 52(c) to dismiss the proceeding for failure to prove a *prima facie* case, and this court reserved decision on the motion. For the following reasons, the motion is granted.

## FACTS

Pursuant to Federal Rule of Civil Procedure 52(a), the court finds the following facts:

1. The plaintiff, Grand Union Mount Kisco Employees' Federal Credit Union, is a federally insured and chartered credit union operating under the rules and guidelines of the National Credit Union Administration ("NCUA"). At the time of the events which form the basis of this suit, the Credit Union had approximately 500 members and over $3,000,000 in assets. Trial Transcript ("Tr.") 237.

2. The Credit Union employed the defendant, Stanley Kanaryk, as treasurer from 1978 until he retired on October 1, 1987, after having announced his intention to retire in April of that year. Tr. 237. Kanaryk was eighty years old at the time of the trial. *Id.* His employment was originally to be on a part-time basis. Tr. 234–38. Kanaryk was the only paid officer of the Credit Union. Prior to his employment with the Credit Union, Kanaryk served as an auditor with the NCUA for eleven years. Tr. 234–35.

3. Kanaryk prepared the Credit Union's financial statements and was responsible for setting up appropriate reserves for bad loans on Credit Union balance sheets. Joint Pre-Trial Order ("JPTO"), Agreed Finding of Fact ("FF") # 10. Kanaryk shared responsibility for maintaining the Credit Union's financial statements and records with two loan officers, who were responsible for keeping records on outstanding loans.

4. At trial, the Credit Union attempted to prove Kanaryk's fraudulent intent and breach of fiduciary duty by focusing on his actions during a discrete time period, September 1986 to September 1987 (the "relevant period"). Tr. 2.

5. During the relevant period, the Credit Union had a functioning board of directors (the "Board"). The duties and responsibilities of the Board are set forth in the Credit Union's charter and bylaws. Joint Exhibit ("Jt. Exh.") 49. Among the Board's responsibilities are the appointment of a supervisory committee, which is to review financial statements prepared by the treasurer. *Id.*

The Committee may employ an independent auditor to gauge the fiscal health and soundness of the Credit Union. Evidence shows that such a committee was in place during the relevant period, and that it did employ an independent auditor annually.

6. The Board's responsibilities also include consideration and approval or disapproval of investment decisions and advice suggested by the treasurer. Jt. Exh. 49. As shown in the minutes of Board meetings during the relevant period, investment decisions were frequently discussed among Board members. Jt. Exhs. 23, 24, 30, 31, 32, 33, 34, 35, 55, 56, 60.

7. At trial, Kanaryk testified that his investment strategy for the Credit Union was to maintain a diversified portfolio of investments by segregating assets roughly into thirds: one third was in cash (in the form of checking accounts, certificates of deposit and money market funds), one third was in loans to members and one third was in securities. Tr. 247–48. Approximately $700,000 to $790,000 [1] of the securities investments were in mutual funds under a Dean Witter Reynolds Inc. account, entitled "Dean Witter U.S. Government Securities Trust Account," (the "Dean Witter Account"). Approximately another $109,000 to $234,000 [2] were in mutual funds under an E.F. Hutton account, entitled the "HIS Government Securities Series," (the "E.F. Hutton Account"); an additional $180,000 to $190,000 [3] were in mutual funds under a W.J. Nolan account, entitled the "Franklin U.S. Government Securities Fund" (the "W.J. Nolan Account"). Most of the investments in these accounts were in mutual funds, the underlying securities of which were pooled government-guaranteed mortgages, or "Ginnie Maes." [4]

8. Plaintiff's expert at trial, Mr. Lloyd Cazes ("Cazes"), is an experienced certified public accountant who presently provides accounting services to the Credit Union.[5] Tr. 23, 76. At trial, Cazes, who reviewed Credit Union financial statements and supporting financial records prepared by Kanaryk during the relevant period, testified that the statements were inaccurate in their presentation of loan losses and investment losses suffered by the Credit Union. Cazes also testified that the monthly financial statements did not conform to generally accepted accounting principles ("GAAP") for financial institutions or to NCUA guidelines. Specifically, Cazes noted that according to both GAAP for financial institutions and NCUA guidelines, changes in the valuation of mutual fund investments had to be recorded monthly in order to reflect the lower of market value or cost. Accordingly, Credit Union financial statements had to record any diminution of value below cost in the mutual fund investments in a line item entry for investment losses. Tr. 30.

9. Prior to September, 1986, the Credit Union's financial statements indicated a loss of $10,000 in the investment accounts. After September, 1986, this figure was increased to about $17,000. Cazes testified that his review of financial statements from September, 1986 through June, 1987 indicated that, while the Credit Union invested an additional $84,000 in the Dean Witter Account alone during that time, and increased investments in other accounts as well, the line item entry for investment losses did not change, but remain fixed at approximately $17,000. Mr. Cazes noted that this was likely an inaccurate figure and that given the volatility of the Ginnie Mae mutual fund market at that time, losses

---

**1.** The precise amount invested in Dean Witter mutual funds shifted during the relevant period, from a low of $700,000 to a high of $790,000.

**2.** This reflects a low of $109,000 to a high of $234,000 during the relevant period.

**3.** This reflects a low of $180,000 to a high of $190,000 during the relevant period.

**4.** Although it is by now part of our national financial vocabulary, it is perhaps worth noting that "Ginnie Mae" is the phoneticization of "GNMA" or the Government National Mortgage

Association, the governmental agency that guarantees the underlying mortgage obligations.

**5.** While Kanaryk's attorney implied at trial that Cazes' dual role as the Credit Union's current accountant and its expert witness on the impropriety of financial statements during the relevant period was a conflict of interest, the court finds no impropriety. At trial, Cazes' testimony concerned financial statements and records compiled long before his association with the Credit Union.

should have been higher. Tr. 35. Cazes testified that the line item entry for investment loss also increased in the May, 1987 financial statement. The figure went from $17,000 to about $24,000.

10. Kanaryk did not dispute that the NCUA examiners rebuked the Credit Union's Board on several occasions for failing to keep accurate records of losses in Credit Union investment accounts. Jt. Exhs. 105, 60. After these audits, NCUA examiners expressed their apprehension and disapproval at meetings open to all members of the Credit Union. Several members of the Credit Union's Board, including the supervisory committee, were present at these meetings.

11. Cazes also testified that the Credit Union's line-item entries for cash reserves on outstanding loans to members during the relevant period both failed to meet NCUA regulations and failed accurately to reflect the dollar amount of loans that were technically in default as of January, 1987. Specifically, Cazes testified that, pursuant to section 1762 of the National Credit Union Act, credit unions must maintain reserves equal to six percent of outstanding loans. The Credit Union's balance sheet as of June, 1987, showed $1,191,155 in loans and cash reserves for loan losses of $10,262. In August, 1987, these reserves were increased to $41,243, most likely in response to suggestions by NCUA examiners. However, according to Cazes' own estimations based on his review of the financial records, the proper amount that should have been allocated to cash reserves as of January, 1987 was $38,000.[6] In addition, Cazes calculated a statutory six percent reserve requirement for the Credit Union in the amount of $71,469 as of June, 1987. Tr. 61–64.

12. Cazes testified that, based upon his review of the Credit Union's financial records, the Credit Union did not have enough earnings to declare a dividend in June of 1987. However, because the financial statements misrepresented the Credit Union's fiscal position, it appeared that earnings were sufficient and the Board authorized dividends of $67,466, collectively. Tr. 66.

13. At trial, Mr. Clarence LaBarge, a forklift operator at the Mount Kisco Grand Union and a member of the Credit Union's supervisory committee during the relevant period, testified that under the Credit Union's charter, the committee was responsible for conducting an annual independent audit. LaBarge testified that an independent auditor was usually retained for these audits. Tr. 111–12.

14. LaBarge testified that the Board regularly examined the Credit Union's financial statements at meetings. Tr. 113. However, he was not aware of errors or misrepresentations in the statements until June, 1987, when Mr. Anthony Oliviera, an examiner for the NCUA, contacted the Board and advised it to liquidate some of its mutual fund accounts, particularly the E.F. Hutton Account, which had accrued large losses. These losses were not accurately depicted in the Credit Union's financial statements at that time. Tr. 66.

15. LaBarge also testified that, when confronted with the NCUA examiner's findings and recommendations in June, 1987, Kanaryk questioned the competence and ability of the examiners, drawing on his own eleven years of experience as a NCUA examiner. Tr. 117. According to LaBarge, Kanaryk maintained throughout this period that the NCUA was engaged in "scare tactics" and was being overly cautious.

16. Mr. Roland Trepasso, currently chief steward at the Mount Kisco Grand Union, was on the Credit Union supervisory committee and was a Board member during the relevant period. Trepasso testified that, approximately in August of 1987, a conflict arose between the NCUA examiners and Kanaryk concerning the Credit Union's investments in certain mutual fund accounts. This conflict concerned losses on investments in the Dean Witter, E.F. Hutton and W.J. Nolan Accounts. According to Trepasso, the NCUA strongly recommended liquidating at

---

**6.** Cazes explained that this figure was the dollar amount of loans that were delinquent for 12 months or more as of January, 1987.

least some of these accounts, which had lost money in the souring market for mortgage-backed securities. Kanaryk, on the other hand, advised against liquidating any of the Credit Union's positions in these accounts. His position apparently was that, while these investments were currently losing money, this loss would only be realized if the Credit Union hastily sold off its investments in the then-deflated market. The Board initially followed Kanaryk's advice. Tr. 126–47.

17. Trepasso also testified that Kanaryk advised the Board to declare a dividend for the financial quarter ending in September, 1987, partially out of concern that failure to declare a dividend would cause a "run on the members"—in other words, would frighten depositors into withdrawing funds on deposit with the Credit Union. Tr. 134.

18. Mr. William J. Brown, chief steward in the trucking department at the Mount Kisco Grand Union, was president of the Credit Union during the relevant period and is currently president. Tr. 149. Brown testified that sometime in September of 1987, the Board had a meeting at which they decided not to declare any dividend for the quarter ending September 31, 1987. Present at the meeting were representatives of Credit Union Management Service ("C.U.M.S.") and Kanaryk. Brown testified that Kanaryk advocated declaring a dividend and was unhappy with the decision not to do so. Tr. 154.

19. Brown testified that the Credit Union routinely limited withdrawals by members to operational accounts, rather than capital accounts. He also testified that Kanaryk had always written his own checks when withdrawing funds from his Credit Union account with no objection from the Board.[7]

20. Brown testified extensively concerning Kanaryk's authorship of extraneous marks on Jt. Exhs. 96, 97, 98, which are copies of account statements from Dean Witter, W.J. Nolan and E.F. Hutton, respective-

ly; Jt. Exh. 99, which is a marked up copy of the Credit Union's balance sheet dated August 31, 1977; and Jt. Exh. 100, which is a variety of worksheets on the value of the W.J. Nolan and E.F. Hutton accounts. Ostensibly, this testimony was elicited to suggest the state of Kanaryk's mind while he was preparing the inaccurate financial statements. Brown testified that he believed Kanaryk to be the author of the extraneous marks on Jt. Exhs. 96, 97, 98, 99; and to have authored at least a portion of Jt. Exh. 100. Tr. 173–80. On cross-examination, Kanaryk's counsel successfully demonstrated inconsistencies between exhibits known to be in Kanaryk's handwriting and those at issue. Tr. 185. Furthermore, plaintiff failed to establish or account for the whereabouts of the exhibits between the time of their alleged authorship and the trial date. During this period of time, approximately six years, the Credit Union's financial statements and worksheets were accessible to a succession of accounting firms, Credit Union members and NCUA examiners. This, coupled with Kanaryk's credible denial of authorship, prevents the court from concluding that Kanaryk actually authored the extraneous comments on the account statements and the other documents.

21. Mr. George Barker was secretary of the Credit Union in June of 1987. He testified that at a Board meeting on June 22, 1987, he sponsored a motion to pay dividends for the quarter ending June 31, 1987 on the basis of Kanaryk's assurances that the Credit Union was not losing money and could afford to pay out dividends at that time. Tr. 215. Barker also testified that the Board decided to follow Kanaryk's advice because he was their "leader." Tr. 217.

22. Kanaryk, defendant in this action, testified that he and the Board members discussed the accounting rule requiring securities held by the Credit Union to be record-

---

7. At trial, plaintiff's counsel implied that Kanaryk had written checks withdrawing his funds on deposit with the Credit Union from improper accounts. Specifically, counsel implied that Kanaryk withdrew funds from capital accounts which he should have withdrawn from operational accounts. However, Brown's answers to these questions did not convince the court that

Kanaryk did anything wrong or improper. First, no Credit Union regulation, charter or by-law was introduced to substantiate these charges. Second, there was no clear evidence that Kanaryk actually had withdrawn funds from the wrong account. Last, Brown himself testified that Kanaryk usually signed his own checks and that Brown had no problem with that. Tr. 183.

ed at the lesser of cost or market value and that they decided against recording such losses and depleting current earnings out of concern that panicking members would initiate a run on the money. Kanaryk testified that he believed the income from the underlying Ginnie Mae securities held in the Dean Witter, E.F. Hutton and W.J. Nolan Accounts would remain stable even though the market value diminished, because the interest rates on the mortgages underlying the securities would remain the same. Tr. 245.

23. Kanaryk also testified that he understood the lesser of market value or cost rule as intended to guard against situations where the Credit Union does not have enough or liquidity to satisfy "shareholder demand"—demands placed on Credit Union member deposit accounts. Kanaryk testified that he believed the Credit Union to be sufficiently protected during the relevant period because as much as a third of the Credit Union's $3,000,000 in assets were in the form of bank accounts—money easily accessed to satisfy any sudden increase in withdrawal demand by the members. Tr. 247.

24. Kanaryk testified that, although the Credit Union Board appointed a credit committee and a delinquent loan committee to monitor loans made to members, these committees did not do their jobs and left him to do much of the loan work.

25. The independent annual audit commissioned by the Credit Union's supervisory committee for the period of May 1, 1986 to April 30, 1987 (the "Audit") was submitted to the attention of Clarence LaBarge, Chairman of the Supervisory Committee. Jt. Exh. 57. The first paragraph of the Audit is entitled "Presentation of Records" and reads in part:

the vast growth of the credit union has taken it out of the realm of a 'one man job,' the treasurer should deal strictly with handling money transactions which leaves very little time to filing and proper records maintenance. It would probably be a good idea to consider a secretary to the treasurer, preferably one with bookkeeping experience.

Under the heading, "Loan Procedure," the Audit reads in part: "I find the treasurer is keeping up the log for the two loan officers.

It seems that he already has enough to do. Another loan officer could be added to keep up with the logs...."

26. On September 30, 1986, the NCUA issued a Supervisory Examination Report (the "Report") setting forth its findings and recommendations after an extensive review of the Credit Union's financial records. Jt. Exh. 105. The Report was sent to William Brown, president of the Credit Union at that time, and was seen by him and by other members of the Board, including Kanaryk. Tr. 241–42. Because the comments summarizing the examiner's review are relevant to the issues in this case, they are quoted in large part, with misspellings and syntactical errors uncorrected:

If the credit union continues to purchase mutual funds they are going to have to keep increasing their valuation/provision for loan loss accounts which will impact on the credit union's dividend paying ability. The investment policy should be in writing and reviewed by the board periodically and if need be adjusted. A delinquent loan officer should be appointed to follow up on all delinquent loans whether in the hands of an outside collection agency or being pursued in house by the delinquent loan officer.... The board fo directors should be made aware that it is not the job of the N.C.U.A. examiner to make the correct entries for the treasyrer or do what is the function of the supervisory committee or the outside auditor.... The glue of all this is the board of directors who must get involved a little bit more to help the treasurer perform his job. In reviewing the minutes the board of directors are active, but must be more so now.

Jt. Exh. 105, "Examination Overview."

27. Both parties stipulated that the Credit Union sold its interests in the Dean Witter, E.F. Hutton and W.J. Nolan Accounts on October 1, 1987 on the advice of NCUA examiners and sustained a loss of approximately $150,000, including close to $20,000 in broker's fees. Tr. 58–9. Credible evidence established that a representative from C.U.M.S. advised the Credit Union to liquidate this account slowly, to take advantage of

a possible upswing in the mortgage-backed securities market at a later date. Jt. Exh. 57. However, the Board decided upon a mass liquidation.

### DISCUSSION

#### I. *Federal Law Claims*

■ As a preliminary matter, the court must address plaintiff's request that a federal common law be fashioned under the National Credit Union Act (the "Act") to remedy Kanaryk's alleged wrongdoing and falsification of Credit Union financial statements. Plaintiff relies for this assertion on the four factor analysis of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), concerning the availability of private rights of action under federal regulatory schemes, and on other cases that have found federal common law to be applicable in order to ensure uniformity in the administration of federal regulatory schemes.

#### A. *An Implied Right of Action*

Specifically the four *Cort v. Ash* factors are:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically of concern to the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted).

Plaintiff argues that federal regulations cover Kanaryk's alleged wrongful conduct and that, under the *Cort* test, this conduct should give rise to a federal cause of action on behalf of the Credit Union which has been harmed by his misfeasance. Specifically, plaintiff points to 12 C.F.R. § 702.3, which is entitled "Full and fair disclosure required" and which provides in section (b)(1) that:

Federal credit union financial statements shall provide for full and fair disclosure of all assets, liabilities, and members' equity, including such valuation allowance accounts as may be necessary to present fairly the financial position; and all income and expenses necessary to present fairly the results of operations for the period concerned.

■ The court's analysis of this section in light of the *Cort* factors compels the conclusion that no implied private right of action exists. When determining whether private rights of action exist under federal regulatory schemes, the dispositive question is one of congressional intent. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Thus, only the first two factors are addressed because if the court finds them not to support a private right of action, the last two need not be reached. *California v. Sierra Club*, 451 U.S. 287, 297–98, 101 S.Ct. 1775, 1781–82, 68 L.Ed.2d 101 (1981).

First, although § 703.2 seems designed to protect credit union members, the court is not convinced that credit union members, or even credit unions, are a class for whose *especial* benefit the regulation exists. This is because the regulation, while addressing the need for full and fair disclosure, seems designed to ensure the accuracy of financial records for the benefit of a variety of actors, not least of whom is the National Credit Union Share Insurance Fund, the regulatory body that insures losses by credit union members. See 12 U.S.C. § 1783 (1988).

However, even assuming, *arguendo*, that credit union members and even credit unions themselves are a special class under the *Cort* analysis, plaintiff's claim that a private right of action exists under the regulations fails because any discernible evidence of congressional intent suggests that no private right of action exists. Rather, the comprehensive statutory scheme bears no trace of a mechanism for the private enforcement of regulatory provisions, while at the same time providing in several places for appropriate action to be taken by the NCUA to correct violations

by federal credit unions or their officers. See e.g., 12 U.S.C. §§ 1784, 1786 (providing for the appointment of examiners to inspect the financial records of insured federal credit unions and allowing for penalties to be imposed on insured credit unions and their officers who violate regulations). The lack of any statutory means to enforce a private right of action, read in light of the extensive administrative remedies provided, has been held in other contexts to provide "strong evidence that Congress intended the administrative remedy to be exclusive." *Taylor v. Citizens Federal Savings & Loan Ass'n*, 846 F.2d 1320, 1323 (11th Cir.1988) (no private right of action under Home Owners Loan Act of 1933).

Moreover, while the Second Circuit has apparently not yet ruled on this issue, other federal courts have found the regulations promulgated under the Act to be incapable of supporting a private right of action due not only to lack of congressional intent, but to lack of congressional authorship. See *Smith v. Dearborn Financial Services, Inc.*, 982 F.2d 976, 978 (6th Cir.1993). In fact, plaintiff has not brought to the court's attention, nor has the court discovered in its own forays into the tangled web of case law, any case which has found a private right of action under the National Credit Union Act or its regulations. See e.g., *Barany v. Buller*, 670 F.2d 726 (7th Cir.1982); *Ridenour v. Andrews Federal Credit Union*, 897 F.2d 715 (4th Cir.1990); *Smith v. Dearborn Financial Services, Inc.*, 982 F.2d at 980; *Rosenberg v. A T & T Employees Federal Credit Union*, 726 F.Supp. 573, 577 (D.N.J.1989); *Heller v. CACL Federal Credit Union*, 775 F.Supp. 839 (E.D.Pa.1991). Therefore, the court concludes that no private right of action exists under 12 C.F.R. § 702.3.

### B. *Federal Common Law Relief*

█ Plaintiff argues, in the alternative, that the need for a uniform body of law in the enforcement and administration of the National Credit Union Act justifies the creation of federal common law relief for Kanaryk's alleged fraud and breach of fiduciary duty. The Supreme Court has held that federal common law may provide a remedy when "uniquely federal interests" permit the creation of common law remedies for statutory violations or when the statute in question specifically gives courts the power to develop substantive law. See *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964); *Wheeldin v. Wheeler*, 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963). Since the Act does not specifically authorize courts to develop substantive law, only the first situation is addressed.

Although the Second Circuit has not yet ruled on this precise question, plaintiff cites *Barany v. Buller*, 670 F.2d at 726, in which the Seventh Circuit held that federal common law remedies could be created under the National Credit Union Act. At issue in *Barany* was a claim by two former members of a credit union's credit committee who were removed from office after reporting improper conduct by another member of the committee. In holding that the remedy of *quo warranto* was available as a matter of federal common law even though not specifically authorized by statute, the court reasoned that the federal interests behind the Act necessitated the creation of uniform federal remedies. *Id.* at 733. See also *Rosenberg v. A T & T Employees Federal Credit Union*, 726 F.Supp. at 578 (federal common law claim appropriate for violation of credit union by-laws).

The Sixth Circuit, in *Smith v. Dearborn Financial Services, Inc.*, 982 F.2d at 976, takes a more restrictive view. *Smith* involved a claim by a credit union member against a credit union for improperly inflating administration fees in the sale of group insurance policies. Although the alleged misconduct was expressly proscribed by 12 C.F.R. § 721.2, the Sixth Circuit declined to create a federal common law remedy, limiting its interpretation of "unique federal interests" to areas "concerned with the rights and obligations of the United States, interstate or international disputes implicating the conflicting rights of the States or relations with foreign nations, and admiralty cases." *Id.* at 981. See also *Ridenour v. Andrews Federal Credit Union*, 897 F.2d at 721.

In our own circuit, Judge Lasker in *Curiale v. Reissman*, 798 F.Supp. 141 (S.D.N.Y. 1992), dealt with a similar question arising under the Home Owners' Loan Act, 12 U.S.C. § 1464 *et seq.* (1988). As in the instant case, plaintiffs in *Reissman* brought an action against bank directors for breach of fiduciary duty, arguing that claims against the officers of federally chartered institutions were so inextricably linked to federal interests as to require the creation of federal common law remedies. Judge Lasker rejected this claim, noting that no showing had been made that state law would in any way impair the functioning of the federal regulatory scheme. *Id.* at 146. See also, *National Temple Non–Profit Corporation v. National Temple Community Federal Credit Union*, 603 F.Supp. 807, 810 (E.D.Pa.1985) (same result).

As in *Reissman*, the instant plaintiff has effectively failed to demonstrate in what sense federal interests would be impaired by the application of a state law rule of fraud and fiduciary duty.[8] Furthermore, the rule which plaintiff proposes—one analogous to an implied cause of action for fraud under Rule 10b–5 promulgated under the Securities Exchange Act, 15 U.S.C. § 78a *et seq.* (1988),—is not practical given the instant facts. Rule 10b–5, by its terms, is designed to deal with fraud in connection with the purchase or sale of a security,[9] whereas the fraud alleged in this case goes toward the improper valuation of investments which defendant neither bought from nor sold to plaintiff. The distinction is relevant because the peculiar position of defrauded plaintiffs in certain 10b–5 causes of action allows them to dispense with proving traditional elements of fraud, such as reliance. See *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (proof of reliance not necessary in case involving failure to disclose adverse information in sale of securities).

While the policy concerns in favor of uninformed market participants as opposed to sophisticated market professionals may justify a lighter burden of proof in actions for securities fraud against those professionals, such concerns are not implicated here, where plaintiff was highly informed with respect to the transactions forming the basis of the claim.[10] Therefore, plaintiff's request that the court fashion a federal common law remedy is denied.

## II. *State Law Claims*

### A. *Common Law Fraud*

#### 1. Parties' Contentions

■ Having dismissed plaintiff's federal claims, we must still address the merits of its state claims under diversity jurisdiction. The Credit Union claims that its former treasurer, Kanaryk, systematically and deliberately overstated the value of certain investments on Credit Union financial statements to avoid revealing considerable losses in market value that were accruing in those invest-

---

**8.** In fact, the National Credit Union Act contains a borrowing provision specifically contemplating causes of action "including intentional tortious conduct, *as such terms are defined and determined under applicable State law*" against credit union officers and directors. 12 U.S.C. § 1787(h) (emphasis added).

**9.** § 10(b) of the Securities Exchange Act of 1934, from whence the rule is derived, states in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of a national securities exchange

. . . . . .

(b) To use or employ, *in connection with the purchase or sale of any security* ... any manipulative or deceptive device....
15 U.S.C. § 78j(b) (emphasis added).

**10.** The evidence at trial established that the plaintiff's board of directors, who authorized this suit and many of whom testified against Kanaryk, either were aware of or were exposed to information, such as NCUA examiner's reports, which would have made them aware of the accounting errors and financial statement inaccuracies. Their position is not akin to that of an uninformed market participant because they not only had access to the reports, they had a duty to apprise themselves of the contents of the reports as credit union directors. See, Credit Union charter and by-laws, Jt. Exh. 49.

ments and failed to keep accurate records of loan losses for much the same reason.

Plaintiff claims that Kanaryk deliberately deceived the Credit Union's board of directors into believing that the Credit Union had enough current earnings to declare dividends, which they did in three of the four quarters covered during this period. Kanaryk's alleged motive in deceiving the Board was his desire to receive dividends on his Credit Union deposits. Plaintiff also claims that the Credit Union's inaccurate financial statements resulted in the declaration of an improper dividend in June of 1987.

The defendant argues that plaintiff's claims should be dismissed for failure to prove the requisite elements of fraud, namely, scienter or intent to deceive or defraud the plaintiff. While Kanaryk concedes that financial statements prepared by him were erroneous, he asserts that his errors were unintentional. In addition, Kanaryk asserts that the Board discussed the financial statements as they were presented, and were aware or should have been aware of the NCUA's objections to them, many of which form the basis of this suit, from the beginning. Therefore, Board members could not have been deceived by any misinformation in the financial statements.

### 2. Legal Analysis

Under New York law, there are two varieties of fraud claims, actual and constructive. A cause of action for actual fraud

> requires proof of a representation of fact which is false and known to be false when made, which is offered to deceive another and with the intention to induce the other to act or refrain from acting, and proof of reliance upon the representation which causes injury.

*Chase Manhattan Bank, N.A. v. Perla,* 65 A.D.2d 207, 411 N.Y.S.2d 66, 68 (4th Dep't 1978) (citations omitted). While it is true that "evidence of fraud is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inferences arising therefrom," *Goshen Litho, Inc. v. Kohls,* 582 F.Supp. 1561, 1564 (S.D.N.Y.1983), New York courts, recognizing the ease with which such infer-

ences may be asserted, typically require fraud to be proven by clear and convincing evidence. See, *Geler v. National Westminster Bank, USA,* 770 F.Supp. 210, 212–13 (S.D.N.Y.1991) (applying New York law).

New York also recognizes a cause of action for constructive fraud. Constructive fraud may be defined as "a breach of duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special attention." *Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186, 193 (2d Dep't 1980). Constructive fraud requires the same showing as actual fraud, except for one crucial aspect—the element of the defendant's scienter, or knowledge of the falsity of his or her representation, need not be proven. *Id.* Rather, what is required is that the plaintiff "prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his confidence in the defendant and therefore to relax the care and vigilance that he would ordinarily exercise in the circumstances." *Id.,* 432 N.Y.S.2d at 194.

The court is somewhat hampered in its analysis of this issue by plaintiff's strategy, throughout trial and in its post-trial briefs, of focusing on the proof of Kanaryk's alleged fraudulent motive and intent. Since the plaintiff did not proceed under a constructive fraud theory, the court will focus most of its discussion on proof of actual fraud. However, the court will discuss constructive fraud where appropriate for a full analysis.

As to actual fraud, the crux of the Credit Union's claim is that financial statements which Kanaryk presented to the Board intentionally misrepresented the Credit Union's financial condition for Kanaryk's benefit. The Credit Union argues in the alternative that Kanaryk's reckless conduct in presenting inaccurate financial statements is sufficient to establish fraud. The Credit Union failed to persuade the court that an action for fraud was sustainable against Kanaryk under either theory.

Rather, the evidence presented at trial established merely that Kanaryk was no longer competent or able to perform his duties ade-

quately as the Credit Union increased dramatically in size. Not doubting that Kanaryk's maintenance of the Credit Union's financial statements was deficient, the court finds that the fraudulent and duplicitous motives ascribed to defendant's deficient statements are unsupported by the evidence.

For example, in its post-trial memoranda, plaintiff stresses that, even on the witness stand, Kanaryk did not appreciate the difference between investments in actual Ginnie Mae bonds and investments in mutual funds comprised of pooled Ginnie Mae bonds, the latter of which are subject to special accounting rules and NCUA guidelines. Plaintiff's Pre–Trial Memorandum of Law at 44–46. From this uncertainty, plaintiff would have the court infer that Kanaryk knew exactly what he was doing when he failed to follow the guidelines, that his failure to follow the guidelines was motivated by his own greed and desire for dividends, and that his confusion on the witness stand was a continuation of this subtle ruse.

The court, however, has a different interpretation: Kanaryk actually was confused. Based on the court's observations of Kanaryk at trial, it does not strike us that Kanaryk was dissembling, covering-up, or prevaricating in any way.[11] Moreover, our opinion is supported by the other evidence presented in this case, namely, numerous records of Board meetings dating from the relevant period, all of which indicate that Kanaryk actually believed the financial statements he prepared were substantially accurate. Kanaryk may have been wrong about the accuracy of the financial statements, but the court is not convinced that any of his inaccuracies were intentionally false or were intended to defraud the plaintiff.

Most significant in our decision is the complete lack of any proof of the alleged fraud or cover-up at trial. While the plaintiff offered copies of Credit Union worksheets and financial statements from the relevant period on which appeared, in handwriting on the margins, value calculations showing loss in the E.F. Hutton and W.J. Nolan accounts, the court attaches no weight to this evidence as proof of Kanaryk's fraudulent motive because these worksheets were accessible to a wide variety of actors during the litigated period, including an NCUA examiner who was recalculating losses in these accounts at the very time the documents were allegedly authored by Kanaryk. Kanaryk himself denies authorship and the court, after comparing documents known to be in defendant's handwriting with the worksheets and marginal notes, finds Kanaryk's denial credible. *Supra* at 10–11. The fact that Kanaryk, as a Credit Union member, had a significant sum on deposit at the Credit Union and was in a position to benefit from dividend declarations is not enough, in itself, to establish Kanaryk's fraudulent motive.[12]

Likewise, plaintiff failed to establish fraud by reckless conduct. Under New York law, fraud may be established either by "proof of an intentional misrepresentation or a representation made with reckless indifference to the truth," *Sherkate Sahami Khass Rapol (Rapol Constr. Co.) v. Henry R. Jahn & Son, Inc.*, 531 F.Supp. 1048, 1062 (S.D.N.Y.1982) (applying New York law), *aff'd in relevant part*, 701 F.2d 1049 (1983). A statement is made recklessly if it is made "without investigation and with utter disregard for whether a basis existed for the assertion." *Modern Settings, Inc. v. Prudential–Bache Securities, Inc.*, 603 F.Supp. 370, 372 (S.D.N.Y.

---

**11.** For example, Kanaryk testified at trial that he took the investments in the Dean Witter and E.F. Hutton Accounts to be investments in Ginnie Maes. The investments were actually mutual fund investments whose underlying securities were Ginnie Maes. It was clear from Kanaryk's testimony that even though he may have been aware that there was a distinction, he did not fully appreciate its significance for valuation purposes. Tr. 243–48.

**12.** Besides the worksheets, plaintiff's fraud claims rest mainly on statements made by Kanaryk taken out of context and on speculation. For example, plaintiff makes much of what he terms Kanaryk's derisive reference to the Credit Union board of directors as "blue collar retards," implying that Kanaryk believed he had controlled the Board. However, plaintiff fails to mention that this term was never used by Kanaryk, but was actually used by Kanaryk's attorney in a pre-trial memorandum. See JPTO, Defendant's Proposed Findings of Fact #34. Furthermore, the term was used to characterize plaintiff's argument, rather than as an expression of Kanaryk's opinion of the Board's intelligence or ability.

1985). Kanaryk's inaccurate financial statements do not rise to this level. This is because the evidence at trial established, not that Kanaryk presented the financial statements with reckless indifference to their truth, but rather that he presented them fully believing that they were true.

Kanaryk testified that he failed to observe the lower of cost or market rule because he believed the rule was inapplicable to financial institutions which kept one third or more of their assets in the form of cash, as did the Credit Union. His explanation as to why certain defaulted employee loans were not marked as losses was credible and was not the result of recklessness.[13] In short, Kanaryk believed that financial statements prepared by him did accurately reflect the financial condition of the Credit Union during the relevant period. While Kanaryk was incorrect and should have ascertained the correct accounting rule for the Credit Union's investments, the court does not find Kanaryk's conduct to be recklessly indifferent.

■ Finally, as to constructive fraud, the plaintiff failed to establish "the existence of a fiduciary or confidential relationship warranting the trusting party to repose his confidence in the defendant and ... relax the care and vigilance he would ordinarily exercise...." *Brown v. Lockwood,* 432 N.Y.S.2d at 194. In a purely business transaction, "the defendant against whom constructive fraud is alleged must have misled the plaintiff by false representations concerning the subject of his superior knowledge or expertise." *Id.,* 432 N.Y.S.2d at 195. However, "[s]uch claims are rarely sustained in New York." *Id.*

In the instant case, the Credit Union board of directors was simply not warranted in reposing confidence in Kanaryk's abilities to the point of relaxing its own fiduciary duties to the Credit Union. Throughout the litigated period, the Board was able to avail itself of the advice and assistance of an independent auditor, whom it was under a duty to employ annually, and the expertise of an NCUA examiner. Both the independent auditor whom the Board eventually employed and the NCUA examiner suggested irregularities in the financial statements. Yet the board of directors chose not to act on this information. Under these circumstances, the court believes that a finding of constructive fraud on Kanaryk's part would not be justified.

### B. *Breach of Fiduciary Duty*

#### 1. Parties' Contentions

■ The Credit Union also alleges that Kanaryk breached his fiduciary duty as an officer to the plaintiff. Specifically, plaintiff claims that Kanaryk's inaccurate representations on financial statements were not merely wrong but were intentionally falsified for his personal benefit, thereby breaching the fiduciary duties of honesty and loyalty owed to the Credit Union. In the alternative, plaintiff argues that Kanaryk had a fiduciary duty of care, and was under an obligation to present truthful and accurate financial statements to the Credit Union's Board members.

Kanaryk argues that he did not breach his fiduciary duties because the financial statements, while erroneous, were presented in good faith and did not arise from disloyal motives or from a desire to deceive the Board as to the value of the Credit Union's investments.

#### 2. Legal Analysis

Since the court has already concluded that Kanaryk is not liable for fraud, we will focus on the second prong of plaintiff's breach of fiduciary duty claim. In order to establish breach of fiduciary duty, it must be shown, first, that there is a fiduciary relationship between the parties, and second, that the fiduciary duty has been breached. *Cramer v. Devon Group, Inc.,* 774 F.Supp. 176, 182 (S.D.N.Y.1991) (applying New York law).

Under New York law, a director or officer of a corporation owes fiduciary duties to the

---

**13.** Kanaryk explained that he did not mark the loans down as losses and refer them to a collection agency because, typically, he was familiar with the personal circumstances of the debtors and believed that they would repay the loans. For example, Kanaryk mentioned the case of a female Credit Union employee who had to take time off from her employment to have a child and who had been unable to make regular payments on her loans. Tr. 266.

corporation. See New York Business Corporation Law §§ 715, 720 (McKinney 1986); *Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557, 568, 483 N.Y.S.2d 667, 673, 473 N.E.2d 19 (1984) (as to corporate directors). These duties have been described as "rules of conscientious fairness, morality, and honesty in purpose" which reflect an "extreme measure of candor, unselfishness, and good faith." *Litwin v. Allen*, 25 N.Y.S.2d 667, 677 (Sup. 1940). In addition, a director owes "a loyalty that is undivided and an allegiance that is influenced in action by no consideration other than the corporation's welfare." *Id.* This is not to suggest, however, that corporate directors or officers are required by law to be superhuman or infallible. Rather, "corporation laws expressly require directors and officers to exercise that degree of diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like positions." 15 N.Y.Jur.2d Business Relationships § 998.

Moreover, the formulation of a standard of care governing corporate fiduciaries is a fact-sensitive inquiry. It has been observed that

It is impossible to establish an exact measure of care which will be deemed sufficient, or negligence which will be deemed culpable, with respect to the duty owing on the part of directors and officers of corporations in the performance of their official functions, because the degree of care required depends upon the subjects to which it is applied, the particular circumstances of the case, and the usages of business.

*Id.*

In the instant case, the evidence established that Kanaryk's treasurer position was originally intended to be a part-time job, but had grown much more demanding in intervening years. When Kanaryk was initially hired in 1978, the Credit Union had total assets of approximately $200,000. At the time of the events in question in this suit, the Credit Union had assets of approximately $3,000,000—a 1500% increase. An independent auditor commissioned by the Credit Union supervisory committee in April, 1987 to review financial records noted that "the vast growth of the credit union has taken it out of the realm of a 'one man job,'" and advised

that an assistant with bookkeeping experience be hired. Jt. Exh. 57. Both in September, 1986 and in May, 1987, the NCUA examiner assigned to review the Credit Union's financial records noted in detail the accounting inaccuracies on financial statements and explicitly advised the Board to get more involved in running the Credit Union and to obtain outside accounting help. Jt. Exhs. 105, 95. According to Kanaryk's uncontradicted testimony, he informed Board members in April, 1987, that he was preparing to retire as treasurer. Tr. 237.

However, the Credit Union board of directors was indifferent to what was rapidly becoming a management crisis. To its credit, the Board's indifference was partially a result of Kanaryk's assurances that the financial statements were not substantially inaccurate. As treasurer, Kanaryk should have apprised the Credit Union of the urgency of the NCUA's recommendations, and of its responsibility to take immediate corrective action by hiring outside accounting assistance. However, the court cannot view Kanaryk's actions in a vacuum and does not conclude that his actions give rise to fiduciary liability in this case.

Rather, the court concludes that reports prepared by an independent auditor and by the NCUA examiner, all of which were addressed to Board members other than Kanaryk and all of which were written in nontechnical layperson's terms, successfully establish that the information needed by the Board to make an informed decision as to the accuracy of financial statements was in their hands. Moreover, the Board not only had access to the independent audits and NCUA reports, it was duty-bound to apprise itself of the contents. See Credit Union charter and by-laws, Jt. Exh. 49. Therefore, as to the relevant issues at trial, the Board was not in any less of a position to take corrective action than was Kanaryk. In fact, the Board was the only entity that could remedy the crisis— by simply deciding to hire outside accounting assistance.

The NCUA examiner, in his September, 1986 report, recognized as much: "The glue that holds all this together is a board of directors who must get involved a little bit

more to help the treasurer perform his job." Jt. Exh. 105. The examiner reiterated his findings, in much stronger terms, in an Examination Overview dated 8/31/87: "In continuing to rely totally on the treasurer, who is retiring from the credit union at the end of the third quarter of 1987, the officials confirmed and acknowledged their lack of understanding and comprehension of existing regulatory restrictions and accounting requirements." Jt. Exh. 95.

In short, the court finds that holding Kanaryk liable as a fiduciary in these circumstances would only reward the Credit Union board of directors for its own misfeasance. The court concludes that Kanaryk acted in good faith and is not liable for breach of his fiduciary duties to the Credit Union.

## CONCLUSION

The court, having considered all of the relevant evidence presented at trial and plaintiff's legal claims, dismisses all of plaintiff's claims against defendant for the reasons stated above. The court orders the clerk of court to enter final judgment in accordance with this opinion.

So ordered.