17-1259-cv
*LBBW v. Wells Fargo*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 24th day of July, two thousand eighteen.

Present:
> BARRINGTON D. PARKER,
> DEBRA ANN LIVINGSTON,
> DENNY CHIN,
> *Circuit Judges*.

---

LBBW LUXEMBURG S.A.,

> *Plaintiff-Appellant*,

v.                                                                    17-1259-cv

WELLS FARGO SECURITIES, LLC, FKA Wachovia Capital Markets, LLC, FORTIS SECURITIES, LLC,

> *Defendants-Appellees*.

---

| | |
|---|---|
| For Plaintiff-Appellant: | TEJINDER SINGH (Joseph Ahmad, Mark C. Holden, David Warden, Ahmad Zvitsanos Anaipakos Alavi & Mensing P.C., Houston, TX, *on the brief*), Goldstein & Russell P.C., Bethesda, MD. |
| For Defendants-Appellees: | JAYANT TAMBE (Todd R. Geremia, Rajeev Muttreja, Alex P. McBride, Amanda L. Dollinger, *on the brief*), Jones Day, New York, NY. |

1

Appeal from a March 31, 2017 judgment of the United States District Court for the Southern District of New York (Oetken, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

LBBW Luxemburg S.A. appeals from a March 31, 2017 judgment of the United States District Court for the Southern District of New York (Oetken, *J.*). The district court granted summary judgment to defendants Fortis Securities, LLC and Wells Fargo Securities, LLC, the latter of which is the successor-in-interest to Wachovia Capital Markets, LLC, in this securities litigation brought under New York law. LBBW, which was previously known as LRI International, S.A.,[1] alleged that Wachovia and Fortis fraudulently omitted material information when they marketed securities of the Grand Avenue II (GAII) Collateralized Debt Obligation (CDO). We review *de novo* a district court's grant of summary judgment, resolving all ambiguities and inferences in favor of the nonmoving party. *See, e.g., Jackson v. Fed. Exp.*, 766 F.3d 189, 192 (2d Cir. 2014). Summary judgment should be granted only if no reasonable jury could return a verdict for the moving party, and there is no genuine dispute as to any material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

### 1.     Background

The GAII CDO had an underlying collateral portfolio of 272 assets, including residential mortgage-backed securities, commercial mortgage-backed securities, and collateralized loan

---

[1] For consistency, we refer to this entity as LBBW throughout this summary order.

obligations. GAII issued different tranches of securities, with varying degrees of seniority, that paid dividends and interest from the cash flows of this underlying pool of assets. Securities in the most senior tranches had first priority to the assets' cash flows. Any money left over after these securities had been paid in full would flow to the second-most senior security, then to the third-most once the second was paid in full, and so forth. Wachovia and Fortis were GAII's Initial Purchasers, meaning that they helped structure the CDO, bought securities from the CDO itself, and then sold those securities to other investors. Fortis purchased the most senior notes from GAII, Wachovia the least senior.

At issue in this case are the Preference Shares, the unrated, least senior securities that GAII issued. Unlike the more senior securities, the Preference Shares provided equity in GAII, and thus were not secured by income earned on the CDO's assets and did not deliver a fixed coupon payment. Because the Preference Shares were junior to all the other securities, they received a quarterly dividend payment only if the tranches above them had been paid in full. Consequently, if the underlying assets went into default, holders of the Preference Shares would see their income decline first. There were 16,500 Preference Shares total. They had a "technical par value" of $0.01/share (the price an investor could redeem them at) and an aggregate liquidation preference of $1,000/share (the amount that would be paid to the investor *if* the CDO were liquidated and *if* the more senior notes were paid off first.).

In September 2006, LBBW, a prospective investor, received marketing materials from Wachovia and Fortis describing GAII, including the CDO's Preliminary Offering Circular. The Offering Circular stated that investors should not "rely[] . . . upon any advice, counsel or representations (whether written or oral)" from Wachovia and Fortis, other than the representations contained in the Circular and attached marketing materials. J.A. 721. The Offering Circular

3

specified that Fortis and Wachovia were not the investors' "fiduciar[ies] or financial or investment advisor[s]," that prospective investors agreed that they were "sophisticated" and understood the full risks of investment, and that Fortis and Wachovia would sell the Securities they purchased from GAII "from time to time . . . at varying prices." *Id.* at 721, 722, 876–77. Finally, the Offering Circular stated that Wachovia and Fortis had an obligation to inform prospective investors if "the characteristics [of the securities] described in these materials" changed "in any material respect" before closing. *Id.* at 716.

On September 28, LBBW committed to purchase $40 million in notes from GAII's top three tranches of securities. It did not buy any Preference Shares. GAII went into default during the 2008 financial crisis. LBBW filed this lawsuit in 2012.

At the heart of LBBW's case is an alleged material omission on Wachovia's part.[2] Unbeknownst to LBBW or any of the investors, Wachovia sold only $11 million of the Preference Shares (two-thirds of the 16,500 shares) at 88% of the Shares' liquidation value. Wachovia retained the unsold 5,500 shares (one-third) on its books. Wachovia then marked these shares internally at 40.9% of their $1,000 liquidation preference before GAII's closing, and ultimately at 52.7% at closing.

LBBW contends that Wachovia marked down the Preference Shares because Wachovia believed the Preference Shares were worth only half their liquidation value, and further that Wachovia believed this because it knew that GAII's underlying assets were risky. Had Wachovia disclosed this markdown, LBBW would never have made its investment in GAII's more senior securities. For this reason, LBBW asserts, Wachovia's failure to disclose the markdown

---

[2] Because the case concerns the Preference Shares, and Wachovia purchased the Shares from GAII, this discussion centers on Wachovia's conduct rather than Fortis's.

constituted fraud as well as a breach of contract, given the Offering Circular's promise to inform prospective investors if "the characteristics [of the securities] described in these materials" changed "in any material respect." *Id.*

Wells Fargo argues that Wachovia marked down the Preference Shares not because it thought that the collateral was risky, but rather because Wachovia wanted to mark the Shares at the price at which it purchased the Shares from the CDO ($1,000/share) minus the fees that Wachovia expected to earn in placing GAII ("purchase price minus offset"). Wachovia had purchased 5,500 Preference Shares from GAII at $5.5 million. It initially expected to earn $3.25 million in placement fees for GAII, so it marked down the Shares at $5.5 million minus $3.25 million, or $2.25 million, which is 40.9% of the $5.5 million it originally paid. At closing, Wachovia learned that it would realize only $2.6 million in placement fees, so it recalculated the markdown to $2.9 million ($5.5 million minus $2.6 million), which is 52.7% of the full $5.5 million value. According to Wells Fargo, Wachovia adopted this accounting approach to manage the risk of having the Preference Shares, which were highly illiquid, on its books while deferring recognition of its placement fees. This way, "[i]f and when" Wachovia sold the preference shares, "it would recognize income based on the price(s) at which it was able to sell the securities." *Id.* at 3114.20.

### 2. Procedural Background

LBBW's 2012 complaint alleged that Wachovia and Fortis's conduct amounted to fraud, breach of contract, and a breach of fiduciary duty. Wells Fargo and Fortis filed motions to dismiss. In 2014, the United States District Court for the Southern District of New York (Oetken, *J.*) dismissed LBBW's breach of fiduciary duty claim, but denied Wells Fargo and Fortis's motions to dismiss the fraud and breach of contract claims predicated on Wachovia's failure to disclose the

5

underlying markdown. *See LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 528 (S.D.N.Y. 2014). Neither side has appealed this decision.

On March 30, 2017, the district court granted Wells Fargo's motion for summary judgment as to the fraud and breach of contract claims. The district court concluded that, while there was no doubt that Wachovia marked down the Preference Shares, LBBW failed to "produce[] [any] evidence to connect the markdown to any secretly held view by Defendants that GAII's portfolio of assets was in trouble." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, No. 12-CV-7311 (JPO), 2017 WL 1194681, at *6 (S.D.N.Y. Mar. 30, 2017). The record instead showed that Wachovia marked down the Preference Shares in accordance with its "purchase price minus offset" calculation method, as described above, and summary judgment was therefore properly granted on LBBW's fraud claim. The court held for Wells Fargo on LBBW's breach of contract claim for largely the same reason: there was no "genuine dispute that the internal markdown on the Preference Shares was not related to any change in Wachovia's view of GAII's underlying portfolio of assets." *Id.* at *10.

The court entered final judgment on March 31, 2017. LBBW argues on appeal that the district court erred in granting summary judgment on its fraud and breach of contract claims. For the reasons that follow, we disagree.[3]

---

[3] At summary judgment, the district court also held that LBBW lacked Article III standing because it had merged with its parent company while this lawsuit was pending. The merger dissolved LBBW under Luxemburg law, and, in the district court's view, "[w]here a company ceases to exist following a merger under the governing law, the action should be dismissed for lack of standing, unless it can be shown that the successor entity was assigned the litigation rights to the case at bar." *LBBW Luxemburg*, 2017 WL 1194681, at *5. LBBW argues that the district court was wrong to hold that a corporation that lacks capacity to sue also, necessarily and without need for further analysis, lacks Article III standing. We agree that the district court erred in this respect. *See* 59 Am. Jur. 2d Parties § 26 ("Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing."); *see also Graziano v. Cty. of Albany*, 3 N.Y.3d 475, 478–79 (2004)); 67A C.J.S. Parties § 10. There is no doubt that LBBW has Article III standing, and that the district court erred in relying on law of the case as to a substitute motion to determine

6

### 3.    Analysis

#### a.    Fraud

"Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). The district court held that Wachovia's failure to disclose the markdown was not a material omission in light of its "purchase price minus offset" explanation. LBBW contends that the district court erred for two principal reasons. First, it argues that the district court was wrong to credit Wells Fargo's explanation for the markdown. Wachovia purportedly used its "purchase price minus offset" accounting method because it was worried that the market for Preference Shares was illiquid. But one of LBBW's expert witnesses attested that illiquidity in the Preference Shares market could not have accounted for such a steep markdown. Therefore, LBBW argues, there was at least a genuine dispute of fact as to whether this explanation was accurate. Second, LBBW further contends, even if Wachovia used the "purchase price minus offset" method, it still must have thought that the markdown approximated the Preference Shares' market value because generally accepted accounting principles ("GAAP") required Wachovia to mark the Shares at the price at which it thought it could sell them to prospective investors. And if Wachovia believed that a 40–50% markdown approximated the Shares' market price, it must have also

---

that it does not. Because we affirm on the merits, however, we decline to address whether LBBW lacks capacity to sue. *See* 59 Am. Jur. 2d Parties § 26 (explaining that capacity to sue is ordinarily "not a jurisdictional issue").

thought there was something wrong with GAII's underlying collateral. We disagree with LBBW on both points.

First, the record establishes beyond any genuine dispute of fact that Wachovia used the "purchase price minus offset" method. This explanation conforms mathematically to the precise markdowns of 40.9% pre-closing, when Wachovia thought it would earn $3.25 million in placement fees, and 52.7% at closing when it learned that it would earn only $2.6 million. Michael Thompson, who was in charge of Wachovia's asset-backed securities CDO group, explained that it was common practice to use this accounting method for securities that had illiquid markets, like the Preference Shares. Additionally, contemporaneous emails between the Wachovia employees who set the mark, Jennifer VanLund Zelnick and Dash Robinson, show that they calculated the markdown using the "purchase price minus offset" method. J.A. 2932. LBBW has, to be sure, produced one expert witness who asserts, based on his expertise in the financial industry, that Wachovia's "purchase price minus offset" explanation cannot be true because such a large markdown "could not have been based solely on a discount for illiquidity." *Id.* at 4409. But the markdown was not meant to approximate a *discount* for illiquidity; rather, Wachovia employees attested that they used the "purchase price minus offset" method *because* they thought the market was too illiquid to price accurately. Moreover, because the record shows that Wachovia actually did use this accounting method, the expert witness's "unsubstantiated speculation" to the contrary does not create a genuine question of fact. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

LBBW's second argument is also without merit. Both Robinson and Zelnick attested during discovery that, under GAAP, they could not have approved the 40.9% and 52.7% markdowns unless they believed that these marks were "justified by market comparables or a view of the market generally." J.A. 2033, 2494. Calculating the Shares' actual market price was difficult

8

because the market was so illiquid, they explained, but Wachovia needed some "support" that the "purchase price minus offset" approach produced a markdown within the "range" of the Preference Shares' likely market value. *Id.* at 2036. In short, LBBW is right that the record shows that Wachovia believed the market would price the Preference Shares at about 50% of their liquidation value. There is *no* evidence in the record, however, that Wachovia believed that this price was a fair approximation of market value *because* it "knew the collateral was troubled," which is what LBBW must show to establish scienter. Pl.-Appellant Br. 43. Robinson and Zelnick decided that the markdown was a good approximation of market value based on the price of comparable securities sold in secondary markets; the record does not reflect any concern at all on their part about the underlying collateral. Indeed, to the contrary, when Robinson estimated the Shares' market value, his financial models assumed that there would be "no defaults on the underlying portfolio." J.A. 2957. LBBW has thus failed to raise a material issue of fact as to Wachovia's knowledge that there was anything wrong with the underlying assets, which is essential to establishing its theory of fraud. Accordingly, summary judgment was properly granted on this issue.[4]

---

[4] Notably, the failure to raise an issue of fact as to scienter would not be fatal to LBBW's case if it could bring a "constructive fraud" or "negligent misrepresentation" claim, neither of which requires the plaintiff to show that the defendant "kn[ew] of the falsity of his or her representation" or omission. *Grand Union Mount Kisco Emps. Fed. Credit Union v. Kanaryk*, 848 F. Supp. 446, 455 (S.D.N.Y. 1994) (quoting *Brown v. Lockwood*, 432 N.Y.S.2d 186, 194 (2d Dep't 1980)). But to do so, LBBW would have to show that it had a special, "fiduciary[,] or confidential relationship" with Wachovia. *Grand Union*, 848 F. Supp. at 455. The record shows, beyond any question of material fact, that it did not. The Offering Circular stated expressly that Wachovia and Fortis were not the investors' "fiduciar[ies] or financial or investment advisor[s]." J.A. 721. The Offering Circular also stated that prospective investors should be "sophisticated" and evaluate the risks of the investment for themselves. *See, e.g., Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011) (dismissing a special relationship theory on similar grounds), *aff'd*, 478 F. App'x 679 (2d Cir. 2012).

### b. Breach of Contract

LBBW also challenges the district court's grant of summary judgment on its breach of contract claim. The Offering Circular stated that Wachovia and Fortis had an obligation to inform prospective investors if "the characteristics [of the securities] described in these materials" changed "in any material respect" before closing. J.A. 716. In LBBW's view, the "price" of the Preference Shares is a "characteristic" of the securities that should have been disclosed, and the defendants' failure to notify it of the markdown amounted to a breach of contract. Again, we disagree. The Offering Circular stated that Wachovia and Fortis would inform investors like LBBW only if the "characteristics *described in these materials*" changed. *Id.* (emphasis added). The Offering Circular and the attached marketing materials did not specify the price at which Wachovia thought it might be able to sell the Preference Shares to prospective investors. Indeed, the Offering Circular even says that Wachovia would sell the Shares at "varying prices." *Id.* at 876–77. The markdown thus did not trigger this duty, and the district court was correct to hold that Wells Fargo and Fortis were entitled to summary judgment on this issue.

\* \* \*

We have considered LBBW's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk